ROBERT G. CAMPBELL *v.* ABM. O. ZABRISKIE, Administrator of ROBERT CAMPBELL, deceased.

A., by deed of assignment, dated July 7, 1834, conveyed to B. real and personal property, in trust, after paying the expenses of the trust, to pay, first, certain moneys he owed to B., and then certain debts he owed to other persons. B., after selling the trust estate, died, intestate, July 5, 1846. On the 1st of August, 1846, A. assigned all his interest in the trust to C , his son, who exhibited his bill against the administrator of B. for an account of the trust, and payment &c. The bill charged that A., after the execution of the trust deed to B., paid, out of his own money, in no way derived from the trust fund, several large items, stating them, of the said debt due from A. to B., and, also, several of the debts to the other persons provided for in the trust deed to B.

*Held,* That A. was an incompetent witness to prove such payments.

The Chancellor, being satisfied from the evidence that nothing was due from B., in his life time, or from his estate, under or by virtue of the trust, refused to order an account, and dismissed the bill.

The bill, filed July 12, 1847, states, that by an indenture made between George G. Campbell, of the city of New York, and Robert Campbell, late of Hackensack, N. J., deceased, dated July 7, 1834, reciting, that, from divers unfortunate circumstances, the said George was apprehensive that he would not be able to pay all his debts, and that the said George was then in business in New Orleans, as a partner with Richard A. Stryker, and that the said George was desirous that his individual property in the city of New York should be applied to his individual debts, and that there was no partnership property of said Campbell & Stryker in the city of New York, but that their business was solely conducted at New Orleans, where all the books of the said firm were kept, the said George, in consideration of the premises and of $1 to him paid by the said Robert Campbell, did grant, bargain, sell, assign, transfer, and set over unto the said Robert Campbell, his heirs and assigns, all and singular the following described lots of land, with the buildings and improvements, (describing five lots in the city of New York,)

To Have and to Hold unto the said Robert Campbell, his heirs and assigns forever; subject to the payment of the mortgage then on the said lots, and to the payment of the interest then due and to grow due on the same, to, for and upon the uses and trusts in the said indenture expressed and declared. And the said George G. Campbell, for the consideration aforesaid, did, by the said indenture, sell, assign, transfer and set over unto the said Robert Campbell, his executors, administrators and assigns, all and singular the household furniture, goods and chattels enumerated and described in schedule A thereunto annexed; and all and singular the debts, dues and demands due and owing to the said George G. Campbell from any person or persons whomsoever: To Have and to Hold all the said lands, goods and chattels, dues and demands, unto the said Robert Campbell, his heirs, executors, administrators and assigns forever; In Trust, nevertheless, as soon as conveniently might be, at public or private sale, for cash or on credit, as to the said Robert Campbell might seem expedient, to sell the said lands and goods and chattels, and to collect the said dues and demands, and to apply the proceeds of said sale and the moneys arising from said dues and demands as follows, that is to say: In trust, in the first place, to retain thereout all the costs and expenses to which the said Robert Campbell might become liable on account of the said assignment, whether of agencies, commissions or otherwise, as well as his lawful and reasonable compensation as trustee; to reimburse himself any advances he might make to effect the purposes of the trust, with lawful interest thereon; and, generally, to pay all expenses consequent upon the creation and execution of the trusts in said assignment contained: In trust, in the second place, to pay himself, the said Robert Campbell, the sum due to him by the said George G. Campbell, amounting to about $7,000: In trust, in the third place, to pay to the several persons named in schedule B to the said indenture annexed the several sums due them, to pay them in rateable order and proportions; and, after fulfilling all the previous trusts thereby created, then, in the fourth place, to appropriate the surplus money, if any, to the payment of the

partnership debts of said firm of Campbell & Stryker. And the said indenture constituted the said Robert Campbell the lawful attorney of the said G. G. Campbell to recover and receive the said dues and demands. That the said indenture was duly acknowledged on the 8th of July, 1834, and was recorded the same day in the office of the Register for the city and county of New York; and was delivered to the said Robert Campbell, who accepted the same, and took upon himself the execution of the trusts therein contained.

That the following is a copy of schedule B annexed to the said assignment:

| | | | | |
|---|---|---|---|---|
| Mary Anderson | - | - | - | $530.00 |
| Eliza Campbell | - | - | - | 330.00 |
| Mechanics' Bank | - | - | - | 820.00 |
| Samuel Martin | - | - | - | 151.00 |
| Abraham Van Boskerck | - | - | 140.00 |
| John D. Halsted | - | - | - | 160.00 |
| Henry Youngs | - | - | - | 60.00 |

That the amount due from the said George G. to the said Robert Campbell at the execution and delivery of the said indenture, and therein mentioned as amounting to about $7,000, was but $5,557, or thereabouts, including interest; consisting of the following items: on book account, $1,580; on bond given by said Geo. G. Campbell, and the said Robert Campbell as security for him, to one Garrit P. Smith, since deceased, for $377; another bond given by said George G. Campbell, and Robert Campbell as security for said George, to the said G. P. Smith, deceased, for $1,000; Robert Campbell, as executor or administrator of said Smith, having, before the making of said indenture, taken up and discharged the said two bonds; another bond given by said George G. Campbell to one Mary Ackerman, for $150, and which was, also, then held by said Robert Campbell; two bonds given by said George G. Campbell to said Robert Campbell, one for $1,000, and the other for $1,450; amounting, in all, to the said sum of $5,557.

That, after the execution of the said deed of assignment, and on or about July 13, 1834, the said Robert Campbell, as trus-

tee as aforesaid, sold three of the lots in said indenture mentioned, for $1,800; and subsequently sold the goods and chattels in said indenture mentioned, for $725.

That the other two lots of land in said assignment mentioned remained unsold until on or about May 14th, 1844, when the same were sold by the said Robert Campbell, for $21,000, subject to the payment of the principal sum of $15,000, secured by the bond of the said George G. Campbell and a mortgage on said premises, That, at or about the time of said sale, the said Robert Campbell received, in cash, $6,000, being the amount of the consideration money of said sale, after deducting the principal sum secured by the said mortgage. That, at or about the same time, the said Robert Campbell paid to William Douglass, the holder of the said mortgage, the sum of $1,575, the amount of interest due on said bond and mortgage; leaving the sum realized by the said Robert Campbell, in cash, from the sale of said last mentioned property, $4,425.

That the said Robert Campbell, in the execution of the said trust, received from one James Mahoney $22, due from him to the said G. G. Campbell; and, as the complainant is informed and believes, received other moneys under said assignment of which the complainant is not particularly informed, and which he prays may be set forth by the defendant in his answer.

That, after the execution and delivery of the said indenture, the said George G. Campbell, out of his own money, in no way derived from the said trust property or funds, paid and satisfied to the said Robert Campbell the aforesaid sum of $1580.42, being the amount due to him on book account at the time of the execution and delivery of the said indenture; and also the principal sum of $1,000, secured by the said bond for $1,000 given as aforesaid to Garrit P. Smith, and all interest thereon; and also the principal sums of $1,000 and $1,400, secured by the before mentioned two bonds given by the said George G. Campbell to the said Robert Campbell, and all the interest thereon accrued; and the said George G. Campbell, also, in like manner, out of his own money, paid off and discharged the amounts due or unpaid at the time of the execution and delivery of the

said indenture to the several persons in said schedule B., and all the interest thereon accrued, except $300, part of the debt owing to Mary Anderson, which was paid by the said Robert Campbell.

That all the business of the said firm of Campbell & Stryker has been finally settled, and all its debts and liabilities have been paid and discharged without the agency in any wise of the said Robert Campbell, and without his having advanced or applied for that purpose any part of the property or proceeds of the property conveyed to him in trust as aforesaid, or any of the moneys received by him under said assignment, or any of the trust funds, or any of his individual funds whatever.

That the proceeds of the sale of the said three lots of land first sold as aforesaid and of the household furniture were more than sufficient to pay and satisfy the amount due said Robert Campbell, from the said George G. Campbell, over and above the amount paid to him by said George G. as aforesaid and all payments made by him of debts due from said George G. in pursuance of said trust, and the expenses of said trust. And that, all the debts and liabilities for the security and payment whereof the said assignment was made being paid and satisfied, and it not being necessary, in the execution of said trust, to sell the other two lots described in said indenture, and the said Robert Campbell being the uncle of the said George G., and they being on terms of confidence and friendship, the title to the same remained in the said Robert Campbell, and the said George G. occupied and enjoyed the same, and received the rents and profits thereof, until about May, 1844, when he, having an opportunity to sell the same, and having negotiated an agreement for the sale thereof, applied to the said Robert Campbell to make a conveyance of the same, to which the said Robert agreed, and, accordingly, did make a deed of conveyance of the same, for the consideration of $21,000, so subject to the payment of the principal sum of $15,000, secured by mortgage as before mentioned. That, out of the consideration money received by said Robert Campbell as aforesaid, he paid, as aforesaid, the interest due on said mortgage, then amounting to $1,575, and the

residue of the said consideration money, being $4,425, the said Robert Campbell retained in his own hands.

That, at the time of the said sale of the last mentioned property, the said Robert Campbell promised that immediately thereafter he would make a full account of the said trust, of the moneys received by him, and also of the payments made in pursuance thereof, and of the amount which he was entitled to retain on account of any indebtedness to him provided for by the said indenture, and of the expenses of said trust, and pay over to the said George G. Campbell the amount which on such account might appear to be due from said Robert Campbell on account of said trust; but the making of such account was neglected until said Robert Campbell died, about July 5, 1846.

That the complainant is informed and believes, and charges, that, on a just settlement of the said trust, there is due to the said George G. Campbell, from the estate of said Robert Campbell, deceased, $7,500 and upwards, which the complainant is now entitled to, by virtue of the assignment thereof to him by him the said George G. Campbell in the bill after mentioned.

That the said Robert Campbell died intestate; and administration of his goods &c. has been granted to Abraham O. Zabriskie.

That, by an indenture of assignment, dated August 1, 1846, the said George G. Campbell, who is the father of the complainant, for a valuable and sufficient consideration therein mentioned, did grant, bargain, sell, assign, transfer and set over unto the complainant, his heirs, executors and administrators, all and singular every claim and demand which the said George G. then possessed, owned, had or was entitled to against the said Robert Campbell, deceased, or his estate, and all and singular any money, debts, accounts or responsibilities of said Robert Campbell, deceased, or his estate to said George G. Campbell, and also, all the estate, right, title, interest, property, possession and demand whatsoever, as well in law as in equity, of the said George G. Campbell of, in and to the said claim, and every part and parcel thereof: To Have and to Hold the same unto

the complainant, his executors, administrators and assigns for ever.

The bill prays an account of the said trust; and that what may be found due to the complainant, from the said Abraham O. Zabriskie, administrator as aforesaid, may be decreed to be paid to the complainant; and for such further and other relief &c.

The defendant, in his answer, admits the deed of assignment from George G. Campbell to Robert Campbell; and that said Robert Campbell accepted the said deed, and that said deed is in the possession of the defendant.

He says, that he knows nothing of his own knowledge of the amount which the said George G. Campbell owed to said Robert Campbell at the date of said deed of assignment, but only as informed by the recital in said deed and some statements of account found among the papers of said Robert Campbell, deceased, and from the complainant's bill. That from these he believes, that the said George G. was, at or about the time of said assignment, indebted to the said Robert Campbell on book account and for monies advanced, over and above the amounts due on the several bonds hereinafter mentioned, in the sum of $1580.42; and the said Robert Campbell was also entitled to receive from the said George G., on said account, interest for balances which had been before struck in the same, between the parties, and for moneys advanced by the said Robert to the said George G., and for which no interest was allowed in such statement of said account as leaves the balance due thereon at 1580.42; but whether any greater sum, with such interest to be added thereto, was not due from the said George G. to the said Robert at that time this defendant is not informed. He admits that the said George G. was at the time of the said assignment indebted to the said Robert Campbell the amount of principal and interest then due on the five bonds in the bill stated, and in the manner therein stated.

That he believes, and therefore insists, that there was due on said bonds, besides the principal sums, interest thereon at the

time of said assignment as follows : (stating how much.)   And he insists that the said George G. was indebted to the said Robert Campbell on said account and said bonds, at the time of said assignment, for principal and interest thereon, in the sum of $5,907, or thereabouts ; but whether the said George G. was then indebted to said Robert Campbell in any other or greater sum this defendant is uninformed except by the recital in said deed of assignment, which states the amount of said indebtedness to be about $7,000.

He admits the sale of the three lots stated in the bill, by said Robert Campbell, on the 13th of July, 1835, and that the consideration stated in the deed given by the said Robert therefor is $1800 ; but, from the accounts of said trust found among the papers of his intestate he believes, and therefore insists, that his intestate only received or retained for the purposes of said trust, and is, therefore, only chargeable with, $1,000, part of said consideration money ; but, as to $800, the residue of said consideration money, whether it was only nominal, or whether it was paid to the said George G., or whether it ever came to the hands of his intestate, or whether it was retained by the purchaser, or expended by his intestate to pay off two certain mortgages which were upon said three lots at the date of said deed of assignment, as this defendant is informed and believes, one given by Joseph Flower and wife, for $250, dated December 8th, 1828, and the other given by Andrew Colvin, for $472.50, dated June 7th, 1826, this defendant is not informed and cannot answer more fully than he has above answered.

He says he is informed and believes, that his intestate did not sell or dispose of, except as hereinafter stated, the furniture mentioned in schedule A annexed to said deed of assignment, but permitted said George G. to retain, enjoy and use the same from the time of said assignment until some time in 1842, when his intestate, finding that the said property assigned to him must come considerably short of paying the amount of the indebtedness of the said George G. to him, insisted that his advances to and losses by the said George G. were too great, and insisted that the personal property in said schedule A ought in some way to

be converted into money or its equivalent, and appropriated to pay some part of the debt due to him, and that Hannah Jenkins, the mother of the wife of said George G., ought to purchase the same and loan it to her daughter, the wife of said George G., and in this way preserve the use of it to the family of the said George G., who was at that time involved in debt, and unable to pay for or buy the same or to retain it against his creditors; the said intestate insisting that it was her duty to share with him the burden of relieving the family, she being possessed of ample means; and that, to carry out said plan, the said George G. procured said furniture to be appraised at $725 or thereabouts, and the said Hannah Jenkins gave her bond to said Robert Campbell for the payment of the said sum, and he thereupon executed to her a bill of sale of said furniture, which remained and still remains in the possession of the said George G. for the use of his family; but that said bond of $725, nor any part thereof, has never been paid to the said Robert Campbell nor to this defendant, nor did the said Robert Campbell, in his lifetime, or this defendant since his death, ever receive any thing for or on account of the same. That the said intestate was to the knowledge of this defendant, for many months before his death, infirm and imbecile in mind, and utterly incompetent to transact business understandingly; and that this defendant has been informed, that, during said period of imbecility, the said bond was procured or obtained from among the papers of said intestate by some one, and that the same was not at his death found among the papers of said intestate; and this defendant has not been able to find or recover the same; and he insists that nothing has ever been received by said intestate for the said furniture.

He admits that the said Robert Campbell, on or about May 14th, 1844, sold the other two lots mentioned in said deed of assignment, for $21,000, subject to a mortgage for $15,000, on which there was then due, for principal and interest, $16,615, which was assumed by the purchaser as part of the consideration money; and that the balance only, which, as this defendant is informed and believes, was $4,385, was received by said Robert Campbell.

That this defendant does not know or is not informed, except by said bill, that the said Robert Campbell, in the execution of said trust, ever received from James Mahoney $22, or any other sum, for money due to said George G. Campbell, or any money from any other person for the purposes of said trust, except the amounts above mentioned received on the two sales of said lands; and this defendant believes and insists that no such moneys were ever received by the said Robert Campbell.

He says he does not know, nor is he informed, that said George G., out of his own money, paid to said Robert Campbell the said sum of $1,580.42 due on book account as aforesaid, and the sums due on said two bonds to Garrit P. Smith, and the sums due on said two bonds to said Robert Campbell; nor does this defendant believe that the said George G. so paid any or either of them, or any part thereof, except a small amount paid out by him from time to time for said Robert Campbell, which ought to be credited on said book account, not exceeding in the the whole $222.39. That said Robert Campbell, after said assignment, paid out, for and to said George G. Campbell, small items, amounting in all to $114.80, and advanced to him $450 in cash; after which the said George G. claims to have paid to said Robert Campbell $400, in cash, leaving a balance of $50, which, with the said sum of $114.80, amounting together to $164.80, ought to be deducted from said sum of $222.39 before the same should be credited on the said amount due on book account; and that for $450 of the moneys entered in said statements as book account the said George G. Campbell, on the 10th of September, 1835, gave to said Robert Campbell his note, payable with interest, which is still held by this defendant as administrator as aforesaid.

That he is uninformed whether the said George G. has paid any of the creditors mentioned in schedule B annexed to said deed of assignment, or whether the debts of the firm of Campbell & Stryker are all paid or not, and whether the said George G. advanced any thing toward the payment thereof or not.

He denies that the amount received for the lots first sold and the household furniture was sufficient to pay said Robert

Campbell the amount due him from the said George G., or that the other lots were held by said Robert Campbell and sold by him for the benefit of said George G.; but that the same were held and sold by him for the payment of the amount due from said George G. to him; and that at the time of the sale by him a much larger amount was due to him from the said George G., on account of the debts referred to in said assignment, than he received on the sale of said property; and that there is now a large amount due to this defendant, as administrator as aforesaid, above all amounts received by virtue of said trust.

He admits that said George G. occupied and enjoyed the two lots last sold, and received the rents thereof, after the date of the said assignment and until the sale thereof; and that said Robert Campbell died on or about July 5, 1846, intestate; and that, on the 31st of the same month, administration of his personal estate was granted to this defendant.

He says he does not know, except from the bill of complaint, that the said George G. Campbell ever assigned his rights or claims against said Robert Campbell to the complainant, or whether any consideration was paid for the same; and he leaves the complainant to such proof thereof (&c.); but this defendant is advised and insists that the said George G. had not any such beneficial interest under said trust as was assignable either at law or in equity; but only had a right to call said Robert Campbell to an account for the performance of the trusts declared in said deed of assignment; and that, therefore, the complainant is not entitled to call this defendant to an account in this Court; and this defendant prays that he may have the same advantage of this exception as if he had pleaded the same.

He admits that said Robert Campbell died seized of considerable real estate, more than enough, together with his personal estate, to pay all his debts, together with the amount claimed by the complainant as due him, as far as said debts are known to this defendant; but he avers and insists that the whole personal property of said intestate at his death was not sufficient to pay the sum claimed by the complainant, and that the same has been much diminished by unavoidable losses in the collection

thereof, by the expenses of the administration and by the payment of the just debts of said intestate against which this defendant had no defence and could not plead the insolvency of the estate of said intestate. And this defendant admits, that, if the complainant can establish any claim against the estate of said intestate, his lands are liable (&c).

He denies that said Robert Campbell, in his lifetime, or this defendant since his death, has refused to render unto either the said George G. or the complainant an account of the execution of the said trust; but says he has always been and still is ready to render an account of the same. And this defendant annexes to this answer, in a schedule marked A, a full and true account thereof, as far as he has been able to ascertain the same; by which it appears that a large balance is still due to the estate of said intestate from the said George G. Campbell, besides any allowance for compensation for the services of said Robert Campbell as such trustee.

Replication.

Testimony. September 30, 1848. The deed of assignment from George G. Campbell to Robert Campbell, dated July 7, 1834, was put in evidence, on the part of the complainant, and marked Exhibit W, No. 1.

*Nicholas Quackenbos,* sworn for the complainant, proves the execution of a deed of assignment, dated August 1, 1846, executed by George G. Campbell and Robert G. Campbell. He says it was executed about the time it bears date, at the office of A. W. Bradford, counsellor at law, New York city. Witness was then a student in that office.

*Cross-examined.* I had been at that time a student at law in that office about a year. The complainant was also a student at law in that office at that time. He was there when I entered the office. George G. Campbell is the father of the complainant.

*Re-examined.* The complainant was admitted to the bar by the Supreme Court, either in the spring or summer of 1847. He had been admitted by the Common Pleas some years before that.

The said deed of assignment was put in evidence on the part of the complainant, and marked *Exhibit W, No.* 2.

*George G. Campbell,* sworn for the complainant; the counsel for the defendant objecting, on the ground that he is interested in the cause. He has lived in the city of New York since 1815. Robert Campbell, the intestate was an uncle of his. There was an account existing between Robert Campbell and him. A paper purporting to be a statement of account, headed, "Robert Campbell, deceased, in account with George G. Campbell," being shown to him, he says: that is a true statement of the account as it existed at the time of said intestate's death, that is, the book account. I paid to and for Mr. Campbell the several amounts as mentioned in this account as debits against him. The result of this account is, that there is a balance of $19.83 in favor of Robert Campbell, deceased. This account is in witness's own handwriting, and is taken from his ledger. The said paper was here offered in evidence on the part of the complainant; the defendant's counsel objecting, on the ground that it constituted no evidence in the cause. The Master marked it *Exhibit W,* No. 3, on the part of the complainant. The ledger referred to by the witness, and the account therein with Robert Campbell, was put in evidence on the part of the complainant, and marked *Exhibit W, No.* 4 on the part of the complainant. The witness says there was a day book kept in connection with the charges in the ledger preceding the entry "By balance $731.42," but none in connection with the subsequent items so far as the account is copied on *Exhibit W, No.* 3, against Robert Campbell. That account in the book, the witness says, is a true account as far as he knows. There is one small article which he now recollects not charged. He recollects the deed of assignment made by him to his uncle. The intestate was one of

the executors to the Smith estate. Thinks said Robert Campbell had paid off the bonds to the Smith estate before the assignment: is not certain. The first three lots sold by Mr. Campbell were sold, he thinks, in 1835, July 13th, for $1,800. Mr. Campbell received that amount. There was no incumbrance on these lots. Witness received no part of this consideration. The other two lots were sold by Mr. Campbell in May, 1844, he thinks. There was a mortgage on these lots for $15,000; and there was $1,575 due for interest at the time of the sale. This property was sold for $21,000, subject to the mortgage. The amount realized by Mr. Campbell from this sale was about $4,425. I received the rents and profits of this property from the time of the assignment to the time of the sale. There was $1,000 lost on the rent for the last year, which was never received by any body. My uncle received $22 as rent from James Mahoney, a tenant in Broadway. I remember the debts which were named in Schedule B annexed to the assignment to Mr. Campbell. These debts have all been paid, except the debt to Mary Anderson, by me. I understood that my uncle paid her $300 of her debt. I don't know whether or not the balance has been paid. The liabilities of Campbell & Stryker mentioned in the assignment have all been paid: I paid part of them and the firm paid part of them; Mr. Robert Campbell never paid any thing on that account; they were all paid prior to 1836. The liabilities which have been paid mentioned in Schedule B, were all paid previous to 1836, except the one to Eliza Campbell, which was paid May 1, 1836. The bond of $1,000 held by the Smith estate was paid off subsequently to the assignment: I paid this to my uncle at one time. I also paid two other bonds to my uncle subsequent to the assignment, one for $1,000 and one for $1,450. The other bond, of $377, was not paid. I received nothing from the proceeds of the sale of the trust estate except $50, which he paid me after the second sale, for which I have given him credit in the account marked *Exhibit W, No. 3*. I received this $50 in two payments of $25 each. The bonds were left in my uncle's possession. A paper purporting to be a receipt signed by Robert Campbell, dated February 28, 1846, being shown to wit-

ness, he says : the signature to that receipt is in the handwriting of my uncle ; he signed it in my presence. I received it at the time it bears date. I told him at the time of the receipt, I thought I ought to have the bonds, that I did not like to leave them in the situation they were. I told him that he promised to destroy the bonds. He said he believed he had destroyed them ; and I told him, then he had better give me a receipt to that effect. He told me to draw a receipt and he would sign it. I did so, and he signed that receipt. (The said paper was offered in evidence on the part of the complainant, and marked *Exhibit W, No.* 5, for complainant.) I should think the annual rent of the property last sold would average $1,750 or $1,800. I did business, in New Orleans, subsequent to the assignment, for about two years. We dissolved in June, 1836. My inducement in making the assignment to my uncle was to save the Broad and Mercer street property, (the property last sold.) The cause of making the assignment was that Mr. Stryker, my partner, had not fulfilled his part of the partnership agreement. He afterwards fulfilled it. Mr. Stryker was in New Orleans at the time of the assignment; and after he came on he made arrangements to pay up his share. After making the assignment, I received remittances from the house at New Orleans pretty punctually. Mr. Stryker paid $2,000 before he left for New Orleans, and likewise made arrangements to pay the debts which I was apprehensive I should have to pay. I dissolved the partnership with Stryker in 1835, February I think. I made an arrangement with another partner ; it was not finally entered into ; he paid me part of the money he was to put in, but no writings were drawn. I made a new investment in the business, $20,000. I got this money from this person who was to have been a partner, William Butcher, of Sheffield, England. The same business was continued until 1836, when I went out and closed it. The Broadway and Mercer st. property was sold at the instance of my uncle; he said that that was the only way to close the matter. He said there was a judgment against Campbell & Crawford, and that, if he transferred the property to me, it would make it liable to that judg-

ment; and the other debts, too, might come against me. He said he would sell it and hand the proceeds over to me. The property was sold at auction; my wife executed the deed. After the sale was made I said to my uncle I wanted the money; and he said he could'nt give it to me, that he didn't know whether I had paid the partnership debts for which he was liable, provided for in the assignment. My wife spoke up and said, that she wouldn't have signed the deed if he hadn't promised to give me the money. He took the money and went home, and from that time until his death was not at my house. Before the sale he said to me I had better have the property sold and go into business with the money. I told him it was a bad time to sell property; and he said one or two thousand dollars wouldn't make much difference to me. I spoke to him subsequently about it, and he gave me $25 the last time I spoke to him about it. I throwed it down, and wasn't going to take it. My uncle didn't pay any attention to the trust property except to come down when the property was sold and execute the deed : he never gave any personal attention to the execution of the trust except that. He used to ask me about it when he saw me.

*Cross-examined.* Mrs. Hannah Jenkins is his mother-in-law. Part of that debt has been paid, about $800, since the assignment, by my son. I did not furnish him with any of the money or means to do it with. The bond to my mother-in-law remains the same as it did, with the exception of the indorsement. I understood that an arrangement was made between my son and mother-in-law to release me and take him as security for the debt. I have no release of the debt. I have not seen the bond since it was executed. Robert Campbell died July 5, 1846. At the time of the date of this bond to Hannah Jenkins, June 10, 1846, my son Robert G. Campbell was 22 years old. He was a man of no property then. I think it was on or about June 10, 1846, that Mrs. Jenkins lent me the $2,500 mentioned in that bond. It was for cash loaned, and not an antecedent debt. I do not recollect whether at the time of the assignment to my son, marked *Exhibit W, No.* 2, there was a suit in contempla-

tion against the estate of Robert Campbell. I think I had spoken to the representative of the estate about the matter before the execution of the assignment. On reflection, I remember I took the accounts to Mr. Zabriskie and he was sick, and I think I did not speak to him about the matter before the execution of the assignment, but my son did. I don't know that I made the assignment so that I could be a witness in case of a suit; but it was made so that, in case I did recover any thing by the suit, it could not go to the creditors of the firm; that was one object of the assignment. I had not talked to my son about being a witness before the assignment. I did not know that I could be a witness at all. I think the assignment was executed the day it is dated. My son at the time did not pay me the consideration of $10. The body of *Exhibit W, No. 5,* is in my handwriting. The word "sen'r" at the end of Robert Campbell's signature is in his handwriting. He sometimes signed his name that way, and sometimes not. The first time I ever saw his name signed sen'r was, I think, about three years before his death. He wrote his name that way after my half-brother who had the same name went there to live. They used to get one another's letters. Prior to that time he used *to write his* name simply Robert Campbell. This paper, *Exhibit W, No. 5,* was signed the day it bears date, at Hackensack, at his room; he had been sick, confined to his room, but at this time he was up, but didn't go out of the house. No one was present at the time the paper was signed except myself; the servants may have been passing in and out; the two servants were Irish, a man and a woman. I asked no one to witness it; there was no one that could witness it; those servants couldn't write their names; that's what I mean. There were neighbors close at hand; Mr. Campbell lived close at the town of Hackensack. At the time this paper was signed Mr. Campbell's mind was in very good condition. He was failing. He had been sick; was taken sick in December previous. At this time he was quite smart. He talked about his business as usual. I don't know what aged man he was when he died; he was thought to be about 83. I saw him out after he signed this paper; he was out with me to the min-

ister's some time after this, about a month before he died. He was out at my cousin's funeral, and that, I think, was about a month before he died. I got no receipt at the time I paid the money on the bond; no receipt passed between us at all except this. I was never so particular in doing business with him as I would have been with another person. I can't recollect when it was I paid him the $1,000 on my own bond; these payments were all made subsequent to 1836. The bond of $1,450 was paid at one time; and so was the bond to him of $1,000 and the bond of $1,000 to the Smith estate, each bond paid off at one time. I did not pay at the same time the interest in arrear on each bond; I paid the interest afterwards. No one was present at any one of these payments that I know of; no one that I recollect of. I took no receipt for either payment. The way I came to pay off the principal first and the interest afterwards was, that I paid the principal off in New York, and didn't know what the interest was; and paid the interest afterwards at Hackensack. I don't recollect when either of the payments was made; the nearest I can come to time is, that they were made between 1836 and 1840. I made no entry or memorandum of them. I have been overhauling my books, and can't find any entry or memorandum of them. I was engaged in the hardware business at the time those payments were made; I had no regular store; was engaged in settling up the New Orleans business. Since 1836 I have kept no day book or cash book, with the exception of the business at New Orleans. I kept a separate set of books for that business. I can't positively tell which of these bonds was paid first. The way I fixed the time of their being paid before 1840 is, that I know that they were paid while I was in the house where I lived in 19th street, and I moved from there in 1840. I moved there in 1836. They were all paid in money, in bank bills. I kept a small bank account at that time. I had a small balance in the bank; didn't deal with the bank; kept my money in the house; it was the Mechanics' bank, New York, where I kept my account. I can't fix the time within the four years during which these bonds were paid off, within a year that any of them was paid off. I think the Smith bond

was paid off in the first year, but have no memorandum of it, and can't fix the time except that I think so. I think I could say that one of them was paid off within the first year, and perhaps two of them. I can't fix a time when they were paid off by referring to the sources from which I received the money; I was receiving money from New Orleans during all that time; I have been trying at home for a week or two to remember the times when I paid off these bonds, but I can't remember, I can't state with certainty whether they were all paid off during the first two years, or during the last two years, or whether the payments were scattered during the four years; but I can state with certainty that I was receiving money during those four years, and that I paid off those bonds some time during those four years. The witness here expressed a desire to correct a part of his examination and states: I was mistaken in saying that the Broadway and Mercer street property was sold at auction; it was sold at private sale. I consented to the sale of it. The price and particulars of the sale were understood by me before the sale took place. The title was given by my uncle and my wife. I don't know whether it was a part of the original contract with the purchaser that my wife should sign off her dower. I know that she did sign off her dower, and I think she signed the same deed with my uncle. She was never paid any thing for signing off her dower right. She was promised something for doing it, by my uncle and myself; there was no specified sum mentioned by my uncle. I mentioned $2,000, and agreed to give her $2,000. She had signed and acknowledged the mortgage of $15,000 given on that property. I know of Mrs. Campbell's threatening to commence proceedings against my uncle for her share for her dower right in that property, and that she employed for that purpose Alexander W. Bradford, counsellor at law in New York. I don't think I spoke to Mr. Bradford in her behalf: I didn't wish to have it done. I didn't want to have any difficulty with my uncle at that time. *Question.* If your uncle had agreed to pay your wife for her dower right in that property, was he the kind of man to be offended with you if she had insisted on it? *Answer.* He was. (This question objected

to by complainant's counsel.) There never was any effort be-
tween my wife and me to get at the amount my wife ought to
have. I think I wrote to him that she was going to commence a
suit for it. My first partner's name was Richard A. Stryker.
I carried on business with him at New Orleans: the business
was carried on at New York and New Orleans. I staid in New
York and transacted the business there, and Mr. Stryker was at
New Orleans. I bought goods in New York. The business we
carried on was the hardware business. I bought the goods at
New York and sent them out to New Orleans; and they ordered
goods from New York and from England sometimes that I knew
nothing about. This partnership with Stryker commenced, I
think, in the fall of 1831, and closed, I think, in the fall of 1835,
in the winter of 1835 it must have been, in the commencement
of the year 1835; it must have been in March 1835, come to
recollect now. In the close of this business I bought Mr.
Stryker out, and was to pay the debts. That firm did not fail.
The debts of Campbell & Stryker have all been paid. That
firm made money: I can't tell how much; we must have made
a good deal of money; but it was all taken from me by another
partner that I got, by the name of Crawford. Mr. Crawford
was my next partner; he had an interest with me at the time of
the close of the partnership with Stryker; it was then Campbell,
Stryker & Co. Crawford had no capital. After Stryker went
out we went right on, and the firm was Campbell & Crawford.
This partnership with Crawford continued until the first of the
year 1836: I sold the stock in June, 1836, but the partnership
was closed before that. I sold the stock for notes, something
like $40,000 the stock amounted to. I did not buy Crawford
out; he had nothing to buy out. I took the property. We had
more than enough to pay our debts, notes and stock together, not-
withstanding Crawford had robbed me. I didn't consider that
we were insolvent. The debts of that firm have not all been
paid: what have not been paid are outlawed. Something like
$12,000, I think, of those debts remain unpaid. I think this is
the amount of the debts of Campbell, Stryker & Co. and of
Campbell & Crawford. I assumed the debts of Campbell, Stry-

ker Co.   Mr. Crawford was a partner first in the firm of Campbell, Stryker & Co.   As I stated before, Mr. Butcher was a partner after Mr. Stryker went out.   Mr. Butcher advanced me $20,000, which I put in the concern.   Mr. Butcher was only a silent partner; and the firm went by the name of Campbell & Crawford.   Mr. Butcher advanced this amount by a single draft for $20,000 : this was just at the time Stryker went out.   I put all that money into the firm; all of that money that was intended I put into the firm.   I put the whole of it into the firm, and took out some afterwards, about $5,000, I think; between $4,000 and $5,000, in money.   Butcher is a solvent man now, a very wealthy man, considered so.   I paid him the whole $20,000 back, shortly after I sold out the stock.   I paid him no interest. I have been in business since I closed the concern in 1836, in the hardware business, in New York, on my own account and on account of others.   I have done no business in New Orleans since 1836 except to close up my old business there or to ship goods there to persons who have ordered them and for whom I have purchased them.   I have done no business since 1836 on my own account at New Orleans, except in the character of an agent.   I think the interest on the Smith bond was paid up regularly before I made the assignment; I am certain of this.   The interest on the others was not paid regularly.   Sometimes my uncle would come down and tell me he had paid the interest on the Smith bond and the Mary Ackerman bond, and I would pay him, and he would tell me he would indorse it on the bond when he went home.   He held the Mary Ackerman bond in his possession.   After the assignment I frequently paid him the interest on the bonds.   I don't know on which bonds I paid him the interest; I paid him interest when he asked for it.   I believe my uncle always made it a practice of coming to my house when he came to New York.   Sometimes he would come down every week or so, and sometimes I wouldn't see him again for two or three months.   My furniture was embraced in the assignment.   I believe I have the most of it in use in my family, and have had it during the whole of the time.   It was sold to Hannah Jenkins, my mother-in-law, by my uncle :

it was sold in a lump. It was appraised by two persons, and my uncle sold it to Mrs. Jenkins at the appraisement, for $725. I don't know whether she paid him the money or gave her bond for it. I don't know that she gave her bond for it; never heard her say so, nor my uncle either. I know there was a bond talked about at the time of selling the furniture. The object of my uncle's selling it was to secure the furniture to my wife. He said he would give it to her, but that he couldn't do so without the creditors taking it. I can't say whether my uncle ever realized anything from the sale of that furniture or not. My mother-in-law lives in the city of New York. I have never seen a bond of that amount purporting to be given by my mother-in-law to my uncle. Mr. John S. Riker did that business. I did not negotiate that sale of the furniture between my uncle and my mother-in-law; the negotiation, as I understood it, was between my mother-in-law and Mr. Riker, who acted for my uncle. I spoke to my mother-in-law about purchasing the furniture before it was sold: the thing was talked of in the family. There was no change in our family arrangements with reference to the furniture: it was moved when the family moved. My son Robert was then living with us as a member of the family. After the assignment my uncle paid one note to James Hill for me, I think; I don't know the amount. He got his money back again. It was while I was at New Orleans. I think it was something like $400 or $500. I don't recollect who called on him to pay it, or how he come to do it. I can't tell the year it was. I recollect seeing a memorandum of it, and have a slight recollection of it. I always thought my uncle was a man of money. He used to frequently leave money with me when he came to New York; and that's the reason I kept a book account. When I gave him a bond for money I always paid him interest; but when he left money with me without my giving him a bond I didn't, because the money was then subject to his order at any time. The $25 which I said I threw down when my uncle offered it to me I took, at the same time, and he is credited for it in my account. I can't recollect the time when my uncle stopped practising law; I think he practised law after 1840. I am aware that he was a man

that transacted a great deal of business; a man in whom confidence was put. He and I were upon the best terms until the sale of the Broadway and Mercer street property; after that, for a while, there was some distance between us, because I thought he had deceived me in the sale of that property, in not paying over the money to me as he had agreed to. I don't know that there ever was any body by when I asked him for this money. I think there must have been somebody by at the day of the sale after it; there must have been some of the family by when I asked him on that day, at my house, for the money. I have no letters on the subject of this money from my uncle. I cannot now name any person except my wife who was present at any time when I asked my uncle for that money. I didn't want at that time that anybody should know that he owed me money. Nobody knew any thing about our business at that time except him and me, that I know of. I can't recollect when it was that my uncle paid the last $25. He paid me the first $25 before he left town after the sale; it was paid in the bank where he got the money for the check; and he told me to come up to Hackensack and he would arrange matters there, or something like that. I gave him a receipt at Hackensack I think for both sums. Bleecker sold the property, and was to receive $100 for it. I paid him this amount, which I received from my uncle, and have neglected to give him credit for it in the account. I think my uncle paid the expense of drawing the deed. There had been efforts made to sell the Broadway and Mercer street property by myself and uncle before it was sold. I was once offered $35,000 for it; this was before 1836, but after the assignment. At that time my uncle and I had concluded not to sell it. It was once put up at auction, after 1836, and bought in by my uncle at $23,000. I haven't written any letters to my father, George Campbell, since my uncle's death, relative to the accounts between my uncle and me; I don't know that I have written to my father since my uncle's death about my uncle's and my business. I wrote to my father shortly before my uncle's death, at Chazy, New York State, but I don't think it could have been about my business with my uncle. I have no letter in my pos—

session that I wrote to my father. There was a judgment in the city of New York against Campbell & Crawford, for about $3,500, in favor of John Van Buskirk, which has since been paid or settled; it was recovered in 1838, I think, am not positive. I settled it since my uncle's death; it was settled by my three notes; no security was given for the notes; the notes were for a smaller amount than the judgment, for $1,200; the notes were at two, three and five years, I think. The judgment was for a debt contracted by Mr. Crawford without my knowledge, and Mr. Van Buskirk is an old friend, and was willing to make it easy for me. That judgment was satisfied of record.

*Re-examined.* Since I closed the business at New Orleans, in 1836, I have been engaged in the real estate business, selling and letting houses, in the city of New York; I have been engaged in this business a part of the time. Since 1840 I have been engaged in the real estate business; I engaged in this in addition to other business. I have also been collector of assessments in the city for four years. No other business besides these except the hardware business which I mentioned before. By these pursuits I have made enough to support my family. Crawford came into the concern after the assignment was made; he was a clerk at the time of the assignment, and after it was given an interest in the business. I think it was the first part of 1835 that Crawford came into the concern; I am not positive as to this. The debt to Van Buskirk was contracted by Crawford; he drew a draft on him for the benefit of the concern, Van Buskirk accepted and paid it: I mean to say that the draft was drawn in the name of the concern, but I don't know whether the firm ever received any benefit from it; I never could trace any account of it. This debt did not arise in any way, and had no connection in any way with the affairs of Campbell & Stryker. At the time I made the assignment of the claim against my uncle to my son Robert there was no claim against Campbell & Stryker, or any of the firm, for which I was liable, except the claim of Van Buskirk. The reason why debts against the firm of Campbell, Stryker & Co. and Campbell & Crawford remained

unpaid was, because many of the notes which the firm had at the time of its dissolution turned out to be bad, and many of the book accounts could not be collected. In 1836 there was a great derangement of money matters throughout the country. My losses by the notes and book accounts amounted to more than made the deficiency. At the time I made the assignment to my uncle I was in advance to the firm of Campbell & Stryker between $9,000 and $10,000. After Mr. Stryker came on I told him what I had done, and he then made an arrangement to pay up his part. He did pay it up, and the business then went on. I think the amount that Mr. Stryker made arrangements to pay in was something like $5,000. My uncle told me he wasn't going to pay my wife for her dower; that he didn't know but that he would have to pay debts for the concern; that was the excuse he made to me. He said that if that claim of my wife was prosecuted he would contest it. *Question.* Did he say anything with regard to the disposition of his own estate? Yes; he said that if Mrs. Campbell persisted in it it would operate to our disadvantage. Mrs. Anderson's maiden name was Mary Mackrell. I understood that my uncle paid her after the sale of the Broadway and Mercer street property $300 on her bond. The bond that my son undertook to pay to Mrs. Jenkins was the true consideration of the assignment by me to my son. I have no interest now in the event of this suit; none that I know of. I don't know whether my son knew or not at the time of this assignment of any intention to prevent creditors from getting hold of the claim; there was no conversation of this kind between him and me. I didn't sign the release or conveyance executed by my wife at the time of the sale of the Broadway and Mercer street property; I don't think I did; I am not now aware that I did. A paper purporting to be a bill of sale from Robert Campbell to Hannah Jenkins, dated April 12, 1844, being shown to the witness, he proves the handwriting of Robert Campbell and Hannah Jenkins to the same; and the paper was put in evidence on the part of the complainant, and marked *Exhibit W*, *Nos.* 6 and 7. I don't know that I had any reason for not more strenuously insisting on the settlement of this claim with my un-

cle, in his lifetime, than I was afraid from the threats he had made; I was unwilling to displease him. The last time I spoke to him about it was in his office. He then told me he would have every thing settled to my satisfaction. I think my uncle held the Smith bond in his possession before the time of the assignment. He was one of the executors of that estate. He did business for Smith in his lifetime.

*Re-cross-examined.* Mary Anderson is dead. The way I became indebted to her was that she put money into my hands to keep for her, and I gave her my note for it. She was an old acquaintance of the family, and used to live at Hackensack. She had other money than this out at interest, and had enough to keep her comfortable. I went up to my uncle's two or three times for the purpose of getting a settlement with him. I don't know that I ever wrote to him for a settlement. I think the last time I spoke to him about a settlement, in his office, before spoken of, was when he paid me the $25.

1848, December 12. *Robert Campbell,* sworn for the defendant. I reside at Hackensack, Bergen county, N. J.; am a nephew of the intestate; a son of his brother George Campbell. My father is yet alive. I live directly opposite the late residence of the intestate; about 150 feet from the door of his house; and have lived there about six years. I was in the habit of seeing the deceased while I lived there almost daily; hardly a week passed without my seeing him. I wouldn't say quite as often as that, because some seasons of the year, in the winter for instance, he would be shut up for a week or two; but in some parts of the year I used to see him daily, in the summer for instance. He died July 5, 1846. For six months before his death he was taken sick. He went out some time after that, but not that winter; not to my knowledge. He was taken sick in December, 1845. I don't recollect that he had a sickness in August, 1845. *Question.* From December, 1845, until his death, what was the situation of his mind as regards his capacity for doing business, intelligently and understandingly? *An-*

*swer.* Well, in my opinion, to the best of my judgment, I don't think he was capable of doing business fairly and correctly from the time he was taken sick until the time of his death, that is, at any time that I saw him. During the first part of his sickness I was in the habit of seeing him almost every day, because he was unwell and we changed about in seeing him occasionally; by "we" I mean his relations. I sat up with him one night. He was quite wild in the first part of his sickness. His relations did not take it upon themselves to stop him doing business during that time; people went there and got their money. He was anxious to do business some how or other. I know he did business. *Question.* Did not his relations advise people who came to pay interest to him not to pay him. (Objected to.) I don't know of any person doing that but myself: I did: I can't recollect the time exactly, but, as near as I can recollect, it must have been in March or April, 1846: I won't say positive about the time. It didn't make much impression on my mind. As near as I can recollect the reason why I persuaded the man not to pay was, that I thought he was not capable of taking care of his money after he got it. His mind varied at times. His situation at times appeared to be stupid and simple : at other times he was rather more lively. *I stated at first, that when he was taken sick in December, he was deranged.* After he got over that his mind seemed to be in a fog as it were. It certainly was the case that he was more sensible, milder and more pleasant to talk to at some times than at others. I don't think his mind was worse towards the last of his life than it was during the winter preceding his death, and I will tell the reason : towards the latter part of his sickness his neice Mrs. Cummings was there to take care of him and keep house for him; and I thought it wasn't worth while for me to go over so often as I did. One day, either he or Mrs. Cummings called me over, and he took me to do because I hadn't been there to see him so often as I had been used to do. He said I had not been there in a month. I had not been there, perhaps, in five or six days. This was just before his death. From this I was of opinion he was getting no worse. During the winter of 1845–6, he had no housekeeper except an

Irish servant woman, and two men. In the first part of his sickness he had no woman in his house at all. George G. Campbell was there part of that winter. He had been there occasionally for a year or two back; not very frequent: I recollect of his being there when intestate was sick two years previous to that. The intestate was never married. George G. Campbell was one of his nephews whom he had brought up. I am a half-brother of George G. Campbell. When George G. was up that winter he staid in the house with the old man. I think the most of the time he was alone with the old man. The other relatives were only visitors, and dropped in occasionally: he staid there; made it his home there. George G. was there off and on during the winter, but went away in the spring. He would sometimes stay for two weeks at a time, and then go away and come back again. George's son Archibald came there once, but I can't recollect his staying there over night. *Question.* Was you there, with the intestate, in his office, after the drawer of his iron safe was broken open? (Objected to.) I was, in company with another person, Adolphus Campbell, a cousin. As near as I can recollect, Adolphus called at my store on this occasion, and said, " let's go up and see the old man." He had frequently been in the habit of calling there to get me to go with him and see how the old man was getting along. It strikes me that before we started something had been said about the safe being broken open; and he wanted to go up and see about it. We went up to the house, saw the old gentleman, and he appeared to be very simple at that time or childish, and the subject about the safe was brought about: I think Adolphus broached the subject to him, and we went into the office to look at it. When we got there the old man came in and looked in the drawers of his book case, and said, they haven't taken anything here : he would open a drawer as he went along and say, they haven't taken much here, until he came to the safe, which stood in the corner. The key of the safe was got: it appears to me it was in a desk that stood there. The safe was unlocked, and we looked at the papers and things that were there. The old man then pointed to a little drawer that was broken open, to show what was broken.

There was a drawer of the safe that from appearances had been broken open. He seemed to regard it as a trifle, as I said before he was very childish. In his right mind he was very jealous of that safe : if you had looked sharp at the safe he would have been very apt to have said something unpleasant to you. He seemed to have a confused recollection about how it had been done, but not clearly and fairly. He was confused, and would call George Archibald, and Archibald George ; frequently that way. Archibald was Archibald Campbell, the son of George G. Campbell, and brother of the complainant. Archibald had been up just before this ; whether the same day or not I don't recollect. I am inclined to think that this safe was the place where he kept his money and papers. I have seen him take out money from the safe to make change. He had no other safe place in the house but this. He didn't seem to be much uneasy about it, or care much about it ; it didn't seem to be an event of much importance to him. He did not say clearly that anything was taken away. George G. Campbell told me at one time that he went into his office and found his bonds and mortgages loose on a handkerchief. (This last sentence was objected to.) I should think this was about half way from the commencement of his sickness, about March. *Question.* Was there not at that time a consultation among the relatives of the old man, in which George G. Campbell joined, about having a commission of lunacy issued, and a guardian appointed to take charge of his estate ? (Objected to.) *Answer.* There was a good deal said among his friends about what was to be done with the old man in the state he was then in, and among the rest, that was talked of, that is whether it wouldn't be proper to have him declared a lunatic. George G. Campbell stood rather in opposition to the rest about the affairs of the old man, about that time, as near as I can recollect. I can't be positive that he was consulted about having him declared a lunatic. George was there off and on. I, Adolphus W. Campbell and Robert S. Gould talked about this thing. Adolphus was a nephew of the old man. The wife of Robert S. Gould was an own sister to George G. Campbell. The old man's mind was such, during the last six months of his life, that

he couldn't recollect his relatives at all times, that is, I don't think so : I don't swear this positive. He was flighty at some times. I was present at the funeral of Robert I. Campbell, a newhew of the old man's. I paid little or no attention to him at that time. Mrs. Cummings kept house for him from four to six months before he died. I can't say whether she was a niece that he well knew. He didn't see her frequently ; she lived in New York. He appeared to be at a loss to understand who she was ; at one time when I was there he appeared to be worried about her being there. He seemed to want to consult me about her being there. I don't think he appeared to know who she was then ; it was at the first of her being there. I think I should know George G. Campbell's handwriting : I have seen him write frequently. I can't say with any certainty whether those papers handed to me are in his handwriting or not. I was one of the appraisers of the estate, and was present at the opening of his iron chest after his death. His papers were then searched for a will. George G. Campbell I think was not present. I don't think that a bond from Mrs. Hannah Jenkins was found': a search was made for one. During the lifetime of the old man, he sent George G. Campbell down with some eggs to sell. The store wouldn't have anything to do with the eggs because they were rotten ; and then the old man sent for me. I remarked to George, in an undertone, the old man is pretty hard to deal with. Yes, said George, he has used me up completely. This was a year or two before his sickness.

*Cross-examined.* I am well acquainted with the handwriting of Robert Campbell, deceased : have seen him write frequently. (*Exhibit W, No.* 5 on the part of the complainant being shown to him, he says) : I certainly think the signature "Robert Campbell, Sen'r," is in his handwriting. He was in the habit, in the latter part of his life, of adding "Sen'r" to his name. I think for some months before his sickness in December, 1846, he had no one round his house except these two men. Before that he had a black woman. After his sickness in December 1846, and before George G. Campbell came, I think Adolphus staid with

him for a day or two, after it was thought he was too wild to be left alone, and then George was notified, and came up. George's son Archibald I saw myself the day after the old man was considered flighty, and I told him to tell his father that uncle Robert was unwell, and he had better come up and see him. I should consider that George was there, off and on, through December, January, February, and perhaps March; and then he quit all at once. He came up just before the old man died, perhaps a few days, and was there the night he died. Mr. Campbell got better, so that he went out in April. I wont say as to March, nor positive as to April. When the weather got milder he went out doors, not much. He was so that he was up and about the house in February and March. His mind got to be more composed towards January, and perhaps previous to that: his wildness of which I spoke ceased about that time. He continued flighty for four or five weeks after he was taken sick. He attended to business in his fashion through the winter. If any body went there to pay him money he paid it. If any body went there to get money he got it, somehow or other. He paid me money once during that time. There were times when I think he knew how much he ought to receive, and times when he did not. I don't think he knew enough to reckon up interest. I saw him some years previous to this attempt to reckon up interest and he didn't seem to know how then; he seemed confused, and had to look at a book. There were times, besides the times when he was flighty, when he didn't seem to know how much he ought to receive, when he was simple and stupid. I kept a grocery store at Hackensack then, and do yet. Mr. Campbell did his trading at my store. I don't recollect of his sending written orders to me during the winter of 1846. I saw him at his house, and he told me to let his men have what they wanted, to use my judgment about it, and not to let them have more than they ought to have, nothing extravagant. He paid me a bill that winter, in January or February. The old gentleman had been in the habit of paying cash for his groceries, but he got out of money, and got a running account with me. He asked me once or twice for his bill, and then I took it there and he paid me. When I went

in with the bill he was in bed: said he, Robert, have you got your bill? Yes, sir, said I. I'll pay you then, said he, and got out of bed, and told me to get his trunk out from under the bed. I got the trunk out. He found the keys, which he had on his person. I unlocked the trunk. He fumbled round the trunk, but couldn't find the money. Confound it, said he, there isn't any money here. At last, I looked, and found the money wrapped up in a paper. I took out the amount of my bill, $10 or $11, as near as I can recollect, and said to him, there's my money. Is it right, said he. I said yes. Well, said he, that bill is paid, and I am glad of it. I gave him his change, and shoved my bill among his papers, some receipts he had there. There was not a great many papers in the trunk; a loose jumbled up mess. There did not appear to be much money; in the neighborhood of $80 or $100, all paper money; I didn't see any silver at that time. I think this consultation about a commission of lunacy took place in the former part of his sickness, within a month after the first of it. It all died away, and didn't amount to anything. There was a good deal of talk between myself, Adolphus and J. M. Gould, in which it was proposed that the old man should make a will. I can say I didn't take full share in that talk myself, but Adolphus and Mr. Gould said a good deal about it. I should think that that was pretty well along in the spring. I think this thing of making a will was proposed to Mr. Campbell; I think so from the talk that was made and from what Mr. Campbell said to me. I went into his room one night, and he lay upon his bed with his back towards me. He asked me who was there. I said, Robert. He said, here they have been bothering me about a will. I told him, why dont you make a will. He said, I don't know who to make it to: shall I make it to all of you? On no, said I, why dont you send for Mr. Zabriskie and get him to make a will. Said he, I can make a will as well as Mr. Zabriskie can. I have no recollection of Mrs. Cummings being there within the last five or six years before Mr. Campbell's death. She lived in the city of New York. I have not seen her at Mr. Campbell's house within 20 years as I recollect. I don't know whether Mr. Campbell had a dislike to

that branch of the family of which Adolphus and Mrs. Cummings were members. If he had he wouldn't have been likely to have shown it to me. I can't say that I recollect any particular instance when he didn't know any of his relations. He sometimes mistook their names; called George, Archibald, and Archibald, George. He always knew me; I took particular notice of that.

*Re-examined in chief.* I came here as a witness for the complainant. I was given to understand that I was wanted to testify to Mr. Robert Campbell's signature.

*Re-cross-examined.* I think he was very careful during his sickness to keep all his closets and other places about his house locked. He kept all the keys about his person.

*John L. Riker*, sworn for the defendant. I reside on Long Island: I am a counsellor at law, practising in the city of New York. I was well acquainted with the late Robert Campbell, of Hackensack: he was a client of mine for many years. I knew his nephew George G. Campbell. I was employed by Robert Campbell in regard to the deed of trust executed to him by his said nephew, and had that deed of trust in my possession for many months. Mr. Robert Campbell was very anxious of having that deed of trust closed, and one of the difficulties was the disposal of the furniture. A negotiation took place to dispose of the furniture to Mrs. Jenkins, the mother-in-law of said George G. That negotiation was pending for a long time. She was unwilling to give the amount at which it had been appraised, I think, and Mr. Robert Campbell wishing to obtain that amount, during the negotiation I had an interview with Mrs. Jenkins at the request of Robert Campbell, either in his presence or that of George G. Campbell—which, I do not remember. That interview did not terminate the negotiation. Afterwards, Mrs. Jenkins, as I understood from George G. Campbell, was willing to give a certain sum, payable, as I believe, at some distant date. That offer was accepted by Robert Campbell, and he executed a

bill of sale, and left it with me, to be delivered on receiving her bond. (This bill of sale is exhibited, and marked *Exhibit W, No.* 6 on the part of the complainant.) I am a subscribing witness to the bill of sale : it was executed by Robert Campbell in my presence. On seeing this paper and the schedule annexed to it, I am satisfied that, when the parties agreed to the purchase, the difference between them as to the then value of the furniture was to have been submitted to two persons, Messrs. Van Antwerp and Jenkins. They estimated the furniture at $722.70, its then value as appraised by them; which was less than its appraisement under the deed of trust, as I believe ; and Mrs. Jenkins executed her bond for $725, the consideration mentioned, and I delivered the bill of sale on receiving from George G. Campbell the bond of Mrs. Jenkins ; which I afterwards delivered to Robert Campbell. The negotiation began with George G. Campbell and terminated with him. *Question :* During this negotiation, and as part of it, did Robert Campbell insist that he had advanced enough for George, and it was time his mother-in-law did something for him? (Objected to.) In order to qualify my answer to that question, I think it proper to state, that, as early as in 1836, a suit in Chancery of New York was instituted by Wright and others against Robert Campbell as a trustee and others, which was pending until the death of Mr. Campbell. I was employed to defend Robert Campbell in that suit, and during the time had frequent interviews with him. Frequently he came with said George G. Campbell ; sometimes alone. At the time he put the deed of assignment from George G. Campbell into my hands to attend to the closing of that trust, whether George G. Campbell was present or not I am unable to say ; but I am satisfied that on one or more occasions when Robert Campbell, George G. Campbell and I were present, Robert Campbell stated that he was anxious to close the trust, and thought that Mrs. Jenkins ought to take the furniture, as he, Robert Campbell, had lost a good deal by his nephew, and that Mrs. Jenkins ought to do something for her daughter, which she had not previously done, as I understood him ; that she had not made advances, is what I mean, for the support of the family, as I under-

stood him.  About the time that this negotiation took place, or soon after, Robert Campbell, either through his own agency, or that of the said George G., effected a sale of the Broadway and Mercer street property.  I drew the papers, and attended Robert C. and George G. C. and his wife to Mr. Sandford's office, who was employed by the purchaser.  I drew a deed from Robert Campbell as trustee, and also a quit-claim deed from George G. C. and his wife, to the purchaser.  The property was subject to a large mortgage, I think of $15,000 : the balance was received by Robert Campbell himself.  The settlement of the trust generally, and the sale of the furniture in particular, was a matter of urgent request on the part of Robert C., and because he said he was a great loser by his nephew George G. C.  I did not know of any urgency on the part of George G. C., no farther than to comply with the wishes of his uncle ; but the delay, as I understood from George G. C., was on the part of Mrs. Jenkins, who was unwilling to take the furniture at the price.  A paper purporting to be a receipt signed by the witness, dated Feb. 3, 1843, being shown to the witness, he says : It is a receipt given by me to Robert Campbell for a counsel fee in relation to this trust : it is for $10, paid me at the time, I suppose, he left the deed of trust with me.  My initials are signed to a memorandum on the bottom of this receipt, by which it appears, that the deed of trust and valuation of the personal property were placed in my hands on the day of the date of that receipt ; and they remained in my possession, as I believe, until I delivered up the bond of Mrs. Jenkins to Mr. Campbell, or upon the closing the sale of the Broadway and Mercer street property, which, I am unable to say.  I am satisfied that the bill of sale as executed to Mrs. Jenkins remained in my hands a considerable time, but how long I cannot state, before I delivered it to George G. Campbell for Mrs. Jenkins.  (The said receipt signed by the witness is exhibited, and marked *Exhibit No.* 1 on the part of the defendant.)  I am unable to state with precision the time at which the bond of Mrs. Jenkins was made payable, but I think it was at a distant date.  I do not recollect whether it was payable with interest.  I should say the bond was payable at several

years : according to the best of my recollection, five years.  Mr. Campbell paid me for drawing those deeds, one from himself and the other from George G. C. and his wife : he paid me $10 for them.  All the parties were present, Robert Campbell, George G. Campbell and his wife and myself, at the carrying through of the sale of said last mentioned lands ; and Robert Campbell received the money, and not a word was said by either of them objecting to his receiving it ; and he received it, as I understood from my knowledge of the affair, to pay his debt : I mean his debt due to him from George G. C., referred to in the deed of trust, amounting to $7,000.  Mrs. Sarah Campbell, the wife of George G. C., did not at that time claim in my presence any part of that money for dower.  She afterwards made a claim, through her counsel, A. W. Bradford, as I understood from Robert Campbell, who retained me to attend to that business : in consequence of which I saw Mr. Bradford, and it resulted either in an abandonment of the claim or no suit was brought that I ever heard of.  (This objected to.)  I have known Mr. Campbell 40 years or upwards, and have always known him to be an accurate and particular man in his transactions, as I believe. He was very particular in taking receipts : not more particular than every trustee ought to be who pays trust money.  In his own transactions he was more particular than I am myself, or, I believe, than others are ; for, I believe he never paid me any sum, however small, without taking a receipt for it at the time of paying it, when he was present, or requested a receipt to be returned to him in those cases where he inclosed the money in a letter to me.

*Cross-examination* (unimportant).

*Richard W. Stevenson* sworn for the defendant.  I reside at Morristown ; I am a physician : I formerly lived and practised at Hackensack : I left there May 11, 1846 : practised there from 1830 until I left.  I knew Robert Campbell, deceased, and attended him the last year I was there : he was sick frequently through that year : he was always infirm.  I attended him in

June and July and in September. I think I attended him somewhat also in December; also January, 1846, and I think in February, but very slightly. I did not attend him in March or April. Some of these attacks were severe : the most severe was in the latter part of December or first of January. After that illness, my opinion would be, that his mind, so far as I saw him, was not in a proper state to do business with intelligence and accuracy. My reasons for this opinion are these : his great age and general infirmity, connected with deranged state of health during that year and previously, and, during that severe illness alluded to, his being actually deranged to all appearance. When I was called to see him on that occasion he was evidently deranged, in December, 1845, the latter part of the month. I find, on looking at my day book, the memorandum, "Deranged," at the date of December 24, 1845. I also found prescriptions there showing the character of his disease at the time. His acts and conversation both indicated a deranged state of mind ; not during the whole of my attendance ; he got better before I ceased attending him ; got more rational. I should not have been willing to have risked any matters of importance in his hands at any time during my attendance on him after the illness in December. I often thought, during my attendance, that he ought not to be allowed to transact his own business. I judged, at the time, that he could be easily deceived or imposed upon. George G. Campbell was there during the months of January and February ; sometimes shorter and sometimes longer. I can't recall anything that was said by him as to the competency of Mr. Robert Campbell to do business. I had frequently conversations with George as to his uncle, his sickness and situation, and what he needed. I can't tell whether I saw the old man after I left off attending him. I can't find in my book any charge against him after the middle of February. It strikes me that I did call to see him and bid him good-bye just before I left Hackensack. I was struck with the coolness with which he took the matter, or indifference which he manifested. He sent a message by me to Judge Ford. I thought his mind had been failing gradually for

some time before this last year alluded to : by some time I mean several years.

*Cross-examined.* When I was called to see Mr. Campbell on the 24th December, 1845, that was the commencement of the most serious illness under which he had labored during that year. The character of that complaint was, a derangement of his bowels, and a very bad cold, and inflammation of the lungs : it was accompanied with fever. He got better by degrees. About the middle of January he was decidedly improved in respect to the derangement of his mind. When I ceased attending him I left him with his mind in a more rational state than it was when I commenced attending him ; so that I did not consider him in a deranged state. He would act very queerly in the morning, when he first waked up, and at night. The middle of February was the time when I ceased attending him professionally. I only visited him occasionnally after the middle of January : I called on him once or twice, and then stopped. I held myself like a minute man, ready to call on him when wanted. I kept out of his way because he was captious and queer. Sometimes, after the middle of January, he was able to understand what was going on around him. You would have to be very careful to lay business before him at the right end, so as to have him understand it, when I saw him. As to his business generally, I don't know much about it : he undertook to pay my bills. I don't know whether he transacted his own business after the middle of January. He would ask for his bills which were due to me : they were not paid by him. He recognized his relations when they came about him. He would always answer questions in his own way. After the middle of January I only was called when he thought he was worse ; and I quieted his apprehensions, and would give him something to relieve him. I believe he always knew me when I went to see him. He might recollect something about his bonds and mortgages and property to a certain extent : I never heard him talk much about such things. I never heard any conversation, during the period alluded to, respecting his property, that I remember. *Question :* After the middle of

January what particular facts and circumstances occurred from which you inferred his want of capacity to do business? He would call for my bill, and then forget but what it was paid, and forget to pay it, and call for it again. It was sent in several times, with such additions as had been made to it from time to time. The way I know he forgot it was paid was, that he would call for it after it had been presented once, and then appear to be surprised that it ran back so far. His plan was, to pay up when he got better so that the Doctor left him. It was characteristic of the old man that he was querulous and captious about his bills, and suspicious. I do not think he was in such a situation that he would have given a receipt for money when he had not received it, understandingly, unless he had been imposed upon. I should think he would have read any paper before he signed it. I do not know that the gradual failure of his mind spoken of in my principal examination was any more than would have been the case with other persons under the same circumstances, in a man growing old, deaf, with no business, generally unpopular with the community, and unsocial in his habits, and living alone by himself. I think it was at his own house that I saw him to bid' him good bye. I told him I was removing to Morristown. It was some message of remembrance to Judge Ford that he gave me, an orderly and proper one, such as one gentleman would send to another : this was shortly before I left. He did not employ another physician until after I bid him good bye.

Dec. 14, 1848.  *Rev. A. H. Warner,* sworn for the defendant. I reside at Hackensack : am Pastor of the Reformed Dutch Congregation there : have been such Pastor since January 10, 1837. Since that time I have resided in the parsonage, about 300 yards from the late residence of Robert Campbell, deceased. I was his nearest neighbor on the west, and was intimately acquainted with him ever since. He was a member of my church ; but became so prior to my settling there. I saw him frequently during the last year of his life, generally every week ; during his last sickness every day ; perhaps not every day, but very frequently ; from December, 1845, I saw him very frequently. He was not

in the habit generally of sending for me in case of any trouble or emergency, except in the latter part of December, 1845. When his mind became bewildered and wild he sent for me two or three times. *Question :* What was the state of his mind, as to capacity for doing business intelligently, during the last year of his life, and especially from December, 1845? In the latter part of that month his mind became very much affected, at intervals. After this, and after his mind was restored, he seemed perfectly to understand himself; but there was no period from December, 1845, to the time of his death, when I should have considered it safe to have transacted any business of importance with him. He had an attack, in August, 1845, of dysentery: I believe it was hardly supposed he would survive it; and after that his mind appeared to be quite as strong and clear as it had been for some years past, until about Christmas. During the first part of his attack in December he was perfectly wild or deranged, so much so that I thought it necessary to call in his nephews. I can hardly say whether, after his attack in December, he was well enough to go out and walk over to my house; but I rather think he did get over to my house after that; there is a slight impression on my mind that he did; it might have been after his attack in August: I rather think it was. His mind was certainly impaired; his remarks were incoherent; he would talk on one subject and pass off to another without any apparent connection. I refer to the time after December. Perhaps this remark is rather stronger than I ought to have made it; there were seasons when he would speak with his usual clearness, when he seemed to understand what he was speaking about. *Question :* Do you recollect any interview with him after December, 1845, in which he did not exhibit some incoherency of mind? I have no distinct recollection on the subject: but I am inclined to think there may have been some few instances. At times my visits were very short: I would merely inquire how he was, and then pass out; I am rather inclined to think there may have been some few instances, perhaps. During his sickness in December he did not recognize his friends. After that, after his recovery or partial recovery, he did recognize them. During his

wildest moments he always knew me. In his illness in December,
and for some time after, I and his friends around him were in the
habit of treating him as a child ; we didn't consider him as ca-
pable of judging for himself what was required. In December,
1845, I called to see him, as I usually did, of an evening, and
found him in a state requiring the attention of his friends, and I
called in his two nephews Robert Campbell, junior, and Adolphus
Campbell, and told them their uncle was not in a situation to be
left alone, and they ought to, see to him : this was the commence-
ment of his illness in December, 1845. I presume the old gen-
tleman was as intimate with me as with any of his neighbors.
I should judge I saw him as often as any of his neighbors.
Mr. Campbell's memory failed him for some two or three years
before his illness in December, 1845. He used to complain that
he was losing his memory. I think his mind had been gradually
failing for the last two or three years before his death. After
his sickness in December, 1845, he became easily confused when
talking on any subject. I have no distinct recollection of this
being the case before that time. His nephew George G. Camp-
bell was there from his attack in December, 1845 : he came up
from New York within the first seven days of his illness, and
attended him, and continued there for some time. Adolphus
Campbell and Robert Campbell were both there during the first
part of his illness in December, 1845. I think Adolphus was
there very frequently during his illness, but George took the
principal care of him. His niece Mrs. Cummings was there for
some time previous to his death ; don't recollect the time she
came there. She had, for a while, I believe, the entire charge
of the family and of him ; while she was there she had : I think
she relieved Mr. George Campbell, if I remember right. He
recognized Mrs. Cummings. When she was there there were
seasons, I think, when he didn't seem to recognize her. Nearly
three years have elapsed since then, and I didn't charge my
mind with it at the time, but I think I speak from my own
knowledge when I say, that there were times when he did not
recognize Mrs. Cummings. Indeed there were times in his ill-
ness in December, 1845, when he did not recognize his nephews ;

although, some time after that time he did recognize them.    I have no recollection of seeing him, after his illness in December, 1845, attempt to transact any business.

*Cross-examined.*   Mr. Campbell did not know his own age : the family record had been lost : he was supposed to be eighty-two years of age, or about.   This ignorance of his age on the part of Mr. Campbell extended throughout the whole of my acquaintance with him : it arose from the loss of the family record. I think the failure of his mind during the latter part of his life, previous to his illness in December, 1845, was not greater than is incident to growing old age.   Previous to December, 1845, he had as much intelligence and recollection as is common with men of his old age.   . It is of very frequent occurrence for men who are growing old to complain of their want of memory.   I should say that this derangement or delirium which occurred in December, 1845, continued during the month succeeding, more or less : it was gradually wearing away, becoming less and less.   He was not decidedly better of this derangement in a week or ten days after his attack.   I think it was a week or ten days after the commencement of his attack that there was a slight improvement.   He was taken sick, I think, in the first of the week.   On Saturday night of that week he sent for me.   I went over, and found his two nephews there, George and Adolphus.   The old gentleman complained that some one was robbing his house.   He wanted me to see that his pocket-book and money were safe.   I saw his money counted that night by George Campbell, and assured the old gentleman that all was right.   The next morning, just after light, he sent for me again, and made the same complaint.   I told him it was Sabbath morning, and he and I must not talk about money on that day.   He said he had forgotten that, and would pass it.   After his recovery from his attack in December, 1845, I think his mind seemed somewhat impaired from what it was before ; his recollection was not so good.   As I said before, in my direct examination, there were times when he seemed to understand himself perfectly well.   His conversation, though somewhat incoherent at times, was rational : I think

I may say this, and yet there were several occasions of which I have a distinct recollection, after he had left his bed, in which his remarks were not rational. On one occasion I recollect his calling my attention to the trees, how beautiful they were, when they were stripped. There was a slow improvement in his health after the month of January, until the month of May; I won't be positive as to this; it all seems as a dream to me. There must have been an improvement in his health, because, late in the spring, towards June, he got out of his office. I attended the funeral of Robert I. Campbell. Mr. Campbell was there. There was nothing that I noticed on that occasion in his deportment other than was consistent with a man in the possession of his faculties. Robert I. Campbell died June 1, 1846. In February and March Mr. Campbell was usually up in his own room when I visited him: I have not charged my mind with this, but I rather think he was not about the house in the latter part of March. It was a characteristic of his mind that he was suspicious of others. I suppose he had as much confidence in me as in any person of his acquaintance; he confided in me as a man and a Christian minister; but I was not always free from his suspicions: he was peculiar in this respect. When I said that I should not have been willing to have intrusted him with any important business, I mean to refer to the ordinary business of life. I should not have been willing to have paid him money or received it from him; not but what there were times when he perfectly understood himself. Circumstances may have altered the case, but I don't think I should have been willing to have paid him interest money after December, 1845, unless in the presence of his nephews or some one of his relatives; though there were times when I think he understood himself perfectly. The way that George G. Campbell came to be at Mr. Campbell's was, I believe, that he was sent for; I won't be certain as to that. George G. came there some few days after Mr. Campbell was taken, say within a week, and was there for several weeks in succession. He made one or two short visits to the city during that time, however. I think he remained until Mrs. Cummings came; that's the impression on my mind. In February and March Mr. Campbell's

mind was impaired; but there were certainly periods when he understood himself perfectly well. I would not say by any means that he was deranged. There are no particular instances or facts which occur to my mind, at present, from which I judge of the incapacity of Mr. Campbell except those I have stated. My own memory is not very good, not very retentive.

*Re-examined in chief.* I am 45 years of age. I can't say particularly with regard to dates, but there was some time when he had to be assisted from his bed to his chair; and I can't say whether this extended over the month of February; pretty much over that month I should suppose; he was very much reduced, much prostrated; his strength was feeble. In August, 1845, he had an attack of dysentery. I called to see him: he was dangerously ill: he seemed uneasy; there seemed to be something on his mind. He had a key on his little finger, which was the key of his valise, which lay on the chair by his side and was said to contain his keys. He told me he had a large amount of money in the house which he wanted me to take charge of, about $3,000. I refused; told him that his nephews were the proper persons to take charge of it. He said, no. I then mentioned that there were other persons in the village who were fully competent to take charge of it, and mentioned over the names of A. O. Zabriskie, Mr. Westervelt, Judge Zabriskie and Henry Banta. He said no, he wanted me to take charge of it. I told him I could not think of it; and I told him to think over it, and I would see him in the morning. At the commencement of this conversation his nephew George was in the room, and Mr. Robert Campbell inquired if we were alone. I told him his nephew George was in the room. He said he must go out, he wished us to be alone. He told me not to mention this to George, nor to tell him anything about it. I met George in the hall as I was going out, and told him of the money being in the house, and that his uncle did not want me to mention it to him. He replied, that he knew the reason why he didn't want me to tell him, that he had been selling some property of his, (George G. Campbell,) and had n't paid his wife for her dower.

*Re-cross-examined.* I think I am certain as to the form of what George said to me as just mentioned. I recollect now something more of that conversation; at that or at some subsequent conversation I asked him how it could be that his wife could claim dower if she had signed the mortgage; and his reply was, that she had not signed the mortgage. There was nothing said by him that Mr. Campbell had not settled with him for the sale of that property. He did not say how it happened that Robert Campbell had sold his, George G. Campbell's property. He did not say any thing about the amount that was coming to his wife. There is some little doubt on my mind whether I did put this question as to his wife's signing the mortgage to Mr. George Campbell: it was put, however, to some one of the family connections, and I received the answer I have mentioned.

*Anthony Tatem,* sworn for the defendant. I reside at Hackensack; have lived there over 13 years. Have known Mr. Campbell by sight and reputation nearly the whole of that time, but have not been personally acquainted with him until 1842, August, when I hired a shop adjoining his premises, which I have occupied since until his death. I am a cabinet maker. That shop is between Mr. Campbell's dwelling house and Mr. Wolfe's house. Mr. Campbell, after I opened my shop there, was in the habit of stopping in; he frequently came in and got little jobs done. I think his mind had become impaired before his illness in 1845. I always thought from the time I first became acquainted with him that he was getting to be childish; he seemed to be forgetful; although he was shrewd enough in business. I don't know that I saw him during the time he was confined to his house in 1845 and 1846. The first time I saw him was after he got out; I think that's correct, although I may have seen him before. The only time that I was in there at Mr. Campbell's house was in the spring of 1846, probably about April 21, 1846. I think I saw him at my own shop a few days previous to that; he walked out past my shop previous to that. He stopped at my shop that time to get me to fix some canes; I think there were three of them. He spoke to me at first to fix

one; and before he left he said, perhaps he would send over more than one, and then sent three over. He asked me what I would charge him for fixing the cane, the one he had with him. I told him two shillings. He said he would send it over; and sent me over three, and wanted me to fix them all. The next time I saw him was at his house as I have above mentioned. I took an account to him at that time, an account of same two or three dollars, which I had against him, in part, previous to his sickness. He was always punctual about paying his accounts, would sometimes scold me for letting them lay too long. Having heard of the state of his mind, (this was objected to,) and having seen him a few days previous, it might have been a week or more, I requested Robert Campbell, Jr., to go with me. He went with me, and we found the old gentleman setting up, I think. I presented him my bill. He examined it, and told me that he didn't think he owed me any thing like that; rather disputed the bill. His nephew Robert told him that he guessed the bill was all right, that I wouldn't make out any thing that was wrong. He required a good deal of persuasion to pay the bill. He objected to the canes particularly. I had charged him three shillings for the three canes, when I had told him I would charge two shillings apiece. He didn't seem to comprehend that I was charging him less than I had told him I would do them for. He told me that I had told him I would charge him two shillings apiece. It required a good deal of talk before he could be convinced that I hadn't charged him as much as I had told him I would. After talking some time he became convinced that the bill was correct, I suppose. He asked his nephew to hand him down a little trunk or valise in the closet. He tried to get the money out of it. He opened it. I don't know whether it was locked or not, and then tried to get the money out of it. He was weak, and, after trying, asked his nephew to get the money out of it, or his nephew offered to do it. His nephew handed him some money. He counted out about half the money, and made out the whole amount, the way he counted it; he counted quarter dollars for halves, and insisted that they were such. After considerable conversation with his nephew and myself he

then paid me the whole amount. I think he paid me the same quarters he before offered me as half dollars : he might have taken some back. I sat and talked with the old gentleman a a little while, and then went home. I refreshed my memory by looking at my books for dates, and at the receipt I gave at that time. When the old man came to my shop to see about the canes I helped him off the stoop. He started to go towards the village, instead of towards his house. When he got just past the corner, so that he could see Mr. De Wolfe's house, he pointed to it and asked me who lived there; he appeared to recollect Mr. Hubert De Wolfe was then living there in that house. Mr. De Wolfe had lived there during all the time that I had lived in the village. He was in the habit of going to Mr. Campbell's frequently. *Question.* From what you saw of Mr. Campbell at these times you have mentioned, or at any other time that you may have seen him after his illness in December, 1845, what is your opinion as to his capacity to transact ordinary business, such as paying or contracting accounts? I should think he was incompetent, so far as I am able to judge. I would not have been willing to have transacted any business with him without the presence of some of his relatives.

*Cross-examined.* I don't know whether all the money in this valise or trunk was silver; I didn't look into it : all that was taken out of it was silver. I think Mr. Campbell finally counted the money to me. I told him when I had enough. I think he made the exact change for me. I sat by the side of him, and he counted the money in my hand; he kept handing out as I told him I wanted more. After counting a dollar or the like of that, and insisting that that was enough, as I said before, he would hand me a half dollar or a quarter, and say, is that enough, and kept on in that way until I got the whole amount of my bill. I don't recollect whether he asked me to receipt the bill or not. I think this bill ran back to some time in November or December. There were no dates to the items of the bill. Mr. Campbell did not state to me any object that he had in having those canes fixed : I dont recollect that he did. I suppose the

most of this account was contracted after December, 1845. That part of the account which was contracted during or subsequent to his illness, except the canes, must have been ordered by somebody else than Mr. Campbell.

*Re-examined in chief.* From what I saw of him at the time this bill was paid, I do not think he was able to count out the money correctly without assistance.

*Rev. Alexander H. Warren,* at this point, appeared and requested to be allowed to correct some part of his testimony; and stated on oath, as follows : I was mistaken as to the time of Mr. Campbell's sickness when he requested me to take charge of his money. It was in 1844, August, instead of 1845. I was also mistaken as to the conversation with Mr. George G. Campbell in the hall. He said the reason why his uncle would not let him know the money was there was, that he had promised his wife her right of dower if she would sign the papers; she had signed the papers and he had not fulfilled the contract, and was afraid of prosecution; that was the substance; not precisely the words. Mr. Campbell was not sick again in August, 1845; not to my knowledge.

*Henry B. Zabriskie,* sworn for the defendant. I reside at Hackensack; was born there; and was acquainted with Mr. Robert Campbell since my recollection. I am 40 years of age; a shoemaker. The old man got his shoes of me, in part, mostly I believe. I saw him in the fall previous to his death; had occasion to call on him as collector of the township. I think I made him a few pair of shoes the winter before he died. I think I went to take his measure; afterwards to take his shoes home. He was unable to come out at that time. He was sitting up in his room at the time. He paid me for the shoes. I think Mr. Gould was present. He asked me the price of the shoes, and I told him. He made something to say about the price; went to his trunk and got his purse; took the money out of the purse; asked me the denomination of some bills,

whether they were ones or twos. During the handling the money fell on the floor, some of it. Among the money were three five dollar gold pieces. He told me to take a two dollar bill; and I gave him the change, twenty-five cents I think it was. He then took up a half dollar and asked me if it was not a dollar; repeated it; and then told me to take my pay, after having paid me. He then tried to put the money in the purse; was unable to do it; and I asked him if I should assist him. He said yes; and I assisted him, and asked him to put the gold in one end, for fear he should pay it out for silver by mistake. He allowed me to do so; and I fastened it up, and he assisted me. When he offered to pay me a second time he offered me half a dollar for a dollar; he gave me half a dollar and a quarter, and said, there's twelve shillings. Nothing else peculiar in his actions except what I have stated. From what I saw of him at these times and as collector, I did not [consider him competent to do ordinary business correctly, such as paying and contracting accounts: indeed I remarked to a friend of the family, that I did not think it was proper to let him do his own business, as any body could get any amount out of him. I noticed before this that his mind was failing; but I considered him competent to do business, at least tolerably so; but I considered him incompetent at this time that I allude to now.

*Cross-examined.* I can't bring to my recollection any thing particular that took place at the time I went to measure him: he seemed to recognize the fact that he had sent for me; and I obtained from him the information I wanted as to what kind of shoes he wanted. He said he just wanted a pair to wear around, and I described the kind of shoes I supposed he wanted, and he said that would suit him. There was nothing occurred peculiar or that attracted my attention, at that interview, that I recollect of: nothing occurred out of the way. He was in the habit of wearing glasses: I think that at the time he paid me for the shoes he had not his glasses on; I am certain not; I think I should have recollected it if he had. His difficulty of putting money into the purse arose from physical disability; his hands

trembled. The failure I saw in him for several years before December, 1845, was nothing more than is ordinary in growing old age. He paid me his taxes in the fall of 1845. I think he counted me the money and asked me if that was right: I think he gave me enough, and I gave him change. He gave me bills, and I gave him change, as in ordinary cases; he did not give me so much that I had to return any of the same money he gave me. He tried on the shoes while I was there: I think I put on one of them for him. He was sitting up on both these occasions. There was a bed in the room the last time, and I think he was sitting on it: he afterwards got a chair. When I went to measure him he was in the room he ordinarily sat in; there was no bed there.

*Nathaniel H. Wilcox*, sworn for defendant. I reside in the city of New York. My wife is a grand-daughter of Dr. John Campbell, the brother of Robert Campbell, deceased. I have been married six years. I was acquainted with Robert Campbell from the time of my marriage till his death. I was present at the funeral of Robert I. Campbell, at the house of Adolphus Campbell, in Hackensack. That funeral might have been two months before the old man's death. I saw Robert Campbell there. He was brought there in his carriage. He came into the room. He was seated, and still retained his cap on during the services. He asked the question where he was. Some one remarked he was at his nephew's funeral. He wished to know who it was, and they told him it was his nephew Robert I. Campbell. He remarked that he did not know him. He said he might have known him, but he had forgotten him. In passing out the door he made a remark about his age: he thought he was remarkably smart for a man of 1600 years old: that was before he got off the stoop. After he got off the stoop on the ground, he made the remark that he was remarkably smart for a man over 100 years old; I thought it was 116, but I won't be positive how much over 100 he said. He was told in my hearing, whose house he was at: he didn't make any remark in answer to this, that I recollect. Mrs. Cummings was conversing with him,

and telling him who she was, a daughter of Dr. Campbell. He said, oh, yes. She was talking with him for some moments. He didn't recollect her. The mention of the name of his brother did not produce any effect on him; not perceptible. I saw him at his own residence after Robert I.'s funeral. He had apparently recovered from his former illness; but I perceived he was very feeble. I don't recollect whether he was more rational at that time than he was at Robert I.'s funeral. I didn't hear him say much while I was in the house.

*Cross-examined.* It might have been two or three years after I was married before I saw Robert Campbell. I was at his house previous to the time I have mentioned after Robert I.'s death: was there in 1843; was at Hackensack on a visit, with my wife, and called on the old gentleman. I think twice is all I have any recollection of of being at his house previous to his death. I never had any other acquaintance with him than on those two occasions. At the time when he was at Robert I.'s funeral, when the remark was made to him as to where he was, I heard these expressions. The room was full of people: most of the family relations were in the room: there was quite a number of people belonging to the village present. I was sitting about ten feet from where Mr. Campbell was sitting. I was not far from the same distance when Mrs. Cummings was speaking to him. It was just previous to his last sickness that I was at Mr. Campbell's house. I don't recollect how long it was after Robert I.'s funeral. I don't think I was in Hackensack after Robert I.'s funeral until after the old man's funeral. I was not at his funeral. I don't recollect whether it appeared, in the conversation Mrs. Cummings was addressing to her uncle, that it was a long time since she had seen her uncle before then. I do not know he had seen her before then. I am under the impression that she had her hat on; I won't be positive as to that.

December 15, 1848. *Mrs. Jane Campbell*, sworn for the defendant. I now reside at Hackensack. Am the widow of Dr. John Campbell. I have resided at Hackensack the greater part

of my life. I was intimately acquainted with Robert Campbell before my marriage; was intimate in the family. I had charge of his sister Hannah in her deranged state, for some years. She was a maiden lady; she resided with Robert Campbell, and kept house for him until she became deranged. He supported her in her deranged state. It was nearly 17 years before the old man's death that I moved away from Hackensack. I visited Hackensack during that time, sometimes three or four times a year, sometimes once a month. I used generally to spend my summers there. I don't know that I ever came more than once or twice to Hackensack that I did not see Robert Campbell. I visited Hackensack in this way pretty much every year until his death, except when I had spells of sickness. I was at the funeral of Robert I. Campbell, who was my son: it took place on the 3d of June, 1846. I saw Robert Campbell at that funeral. He didn't know me at that time. He came into the room, took his seat next to me, on the sofa. Ann Maria Cummings, my daughter, introduced me to him; said, uncle Campbell, this is mother, your brother the doctor's widow. He appeared to be much affected; took me by the hand. She endeavored to make sensible him that it was Robert, the one that had died. He believed, he said, that it was my child, but could not recollect about it; he believed it was my son. I don't think he, at any time that day, seemed to understand distinctly who Robert was. I noticed his speaking of the walls, that they were painted, and how pretty they were, and said he would have his own walls painted. I had seen him about a year before this. He didn't know me then, but seemed to recollect me in a few minutes. He was dressed then in such a queer way that I thought it very strange to see the old gentleman. He had on a figured double gown, lined with wadding, a woolen tippet round his neck, and a little cap on; it was a very warm day; the perspiration was rolling off his forehead. When he came and seated himself by me he said to me, madam, I don't know you. He took me by the hand, and cried, and said to me, Jane, I am a poor, a miserable old man, unable to help myself. When I went away he asked me to call again and see him; and I said

I would. For two years before his death I noticed that his mind had been failing very much. He had been well acquainted with my daughter Mrs. Cummings from her infancy up; she lived in the place. After she had got married, and during her widowhood, she lived in New York. When she lived in New York she was in the habit of visiting him, and of doing errands for him, making purchases for him in the city. It was about five weeks before his death that Mrs. Cummings came up to take care of his house; from four to six weeks. When Mrs. Cummings came and sat down by him at Robert I.'s funeral, he didn't at first know who she was; thought she was a stranger. After she spoke to him, and told him who she was, he was sensible that she was his housekeeper; he used to call her by that name.

*Cross-examined.* I don't recollect that there was any quarrel between my family and Robert Campbell. I do not know that Robert Campbell was dissatisfied or displeased with my branch of the family. The old man never told me of any difficulty between him and my son Robert. If there had been any I think he would have told me, for he was very free in telling me any thing that turned up about my children. I was at his house the spring he died; went up to see him purposely; it was in March. Went up again on Friday before he died. Mrs. Cummings went there to take charge of his house before Robert I.'s funeral. At the funeral of Robert I. Campbell as soon as Mrs. Cummings spoke to him he knew her. He didn't think her a stranger, as soon as he heard her voice he would recollect her. He commonly wore glasses. I don't recollect that he had his glasses on at the funeral. I never saw Mr. Campbell go about the house with a dressing gown before that time; he used to wear one in his office in the summer time. He was always social and friendly to his brother, my husband, and me and my children. I am 79 years old next June.

*Mrs. Jane Amos,* sworn for defendant. I live in Hackensack: am a daughter of Adolphus W. Campbell. I was at Robert I.

Campbell's funeral. I was not married then. I saw Robert Campbell there. He did not recognize any of his old acquaintances there. He came in the room and sat down: they went and spoke to him, and he didn't know any of them. Aunt Cummings went up to him and asked him if he knew who she was; and he said he did not. She told him she was Dr. John Campbell's youngest daughter. She asked him if he knew whose funeral he came to attend. He said, no; and she told him it was Robert I. Campbell, that had studied law with him. He said he had no recollection of him at all: and he asked where he was; and they told him he was at Adolphus's. That's all I heard him say in the room. When he was going off, on the stoop, he turned round and said sixteen hundred years old, and, going down the steps, he turned round and said, don't you think I am a smart old man for my age. When they told him he was at Adolphus's house the first time, he said oh. When they told him the second time he had forgotten it, he didn't seem to know where he was. My father was at Robert Campbell's the winter he was sick. I believe it was about a month he kept attending him. I was at Robert Campbell's house after Mrs. Cummings went there, the summer he died, quite often. I noticed when I was there, that he didn't know Mrs. Cummings unless she told him who she was. He didn't know me that summer when I went there. He didn't know me two years before this sickness in the summer when I went there. He had always known me before that when he was in his right mind. The first week Mrs. Cummings was there I staid with her. We were going up stairs, and passing his door I looked in and saw he had three lights and a large fire in the grate, and his cap and overcoat on. I told my aunt of this; this was at night, in the month of June. His bed was then up stairs.

*Cross-examined.* I am in my 22d year. The way I know that Mr. Campbell did not know Mrs. Cummings is, that, the next morning after I saw the lights and the fire, when I came down in the morning, he didn't know me, and I asked him if he knew aunt Cummings, and he said he didn't. He never knew me when

27

I was there; I mean when he was sick. The way I know he he didn't know me was, that, when I spoke to him, he would say, who are you. He didn't appear to be angry about my being there. He didn't say any thing at the breakfast table to me; we breakfasted at the same table. After Mrs. Cummings came there Mr. Campbell used to go up and down stairs to and from his bed-room. He walked about his house, and into his office. I don't know whether he walked out into the yard or into the street. The occasion I have mentioned when he asked who Mrs. Cummings was is the only time he asked such a question in my presence.

*Garret Myer*, sworn for defendant. Have lived in Hackensack about thirteen years; am in my 75th year; am the father-in-law of Adolphus W. Campbell. I knew Robert Campbell about 50 years: I have lived in Bergen county about 55 years. I was present at the funeral of Robert I. Campbell; saw Robert Campbell there. After the service I walked out on the stoop; there were a few of us there. I turned towards the hall, and who should come out but Mr. Campbell; not exactly out, but towards the stoop, on the step. As he came out I gave him the hand and said, how do you do Mr. Campbell. He said, who are you, I don't know you. Then Mr. Adolphus Campbell said, it's my father-in-law, Mr. Myer. Says he, I am very smart according to my age. Then I won't be certain whether I asked him how old he was or whether he said it without my asking him, he said he was 1600 years old. That's about all I heard. I had noticed before that time, as I met him on the road, he was deficient from what he used to be; I mean in mind. I don't recollect that I met him on the road before this after his sickness in December, 1845. It was perhaps, I should say, two or three years before he died that I noticed his deficiency in mind. There was a very great change in his mind between the time I met him on the road and the time I met him at the funeral. I was at his house during his first sickness in the winter before he died, once or twice. He had very little to say then; he was quite deaf, and hard of hearing.

*Cross-examined.* There was a considerable number of people at the funeral; the two rooms and hall were full. When I gave my hand to Mr. Campbell he gave me his hand. When I went to see him in the winter I believe he knew me. I don't think there was any thing occurred that was out of the way; there was little or nothing said. I can give no other reason for his deficiency of mind than my opinion: I took it from his discourse, and I can't remember any thing particular that he said; but I supposed it might be possible he might be getting childish. I went with Adolphus when I went to see Mr. Campbell in the winter. I don't recollect whether he recognized Adolphus, or whether Adolphus spoke to him. I had no business or dealings with him within two or three years before his death. I don't recollect how long, but I know he had been deaf for quite some time before his death.

*Miss Ellen Campbell,* sworn for the defendant. I reside at Hackensack. Am a daughter of Adolphus W. Campbell. I now live and have always lived with him. Am in my seventeenth year. I knew Robert Campbell, and he knew me, before he was taken sick in December, 1845. In the latter part of that sickness, when he was recovering, I went to see him occasionally. Sometimes, when I went there, he was in bed, and sometimes sitting up. When I took things to him he would get right out of his bed and take things. He wasn't confined to his bed. His bed was then in the lower back room; what was called the family room. That winter, when I went there, he didn't know me. He hasn't known me for two or three years; I am sure for two years he hasn't known me. Always asked me who I was. I told him I was Adolphus's daughter. He always asked me when I went there, who I was. I think his bed continued in that lower back room until my aunt Cummings came. I was there after my aunt Cummings was there; used to go there to see him and to see her. I staid there at nights with my aunt Cummings; I can't say I staid very often. At those times he didn't know who I was; always asked who I was. I won't be positive, but I judged myself, that he didn't know her.  what

made me judge so is, that he never called 'her by name, when he wanted her to do anything for him. At one time he told her she was his little housekeeper.

*Cross-examined.* During the time my father was at Mr. Campbell's I used to go there. After he left, Mr. George Campbell came there, and then I didn't go there. I didn't go there while Mr. George Campbell was there. After he left, my father took care of Mr. Campbell, and then I used to go there quite often. Mr. George Campbell left somewhere in March or April. My father took care of Mr. Campbell about a month, I think, and George Campbell did not come there until father left. My father staid there pretty steadily that month; had his bed and bedding there; was there a good deal of the time, days and nights; was very attentive to him. After I told Mr. Campbell who I was, he would say, oh; and that's all he would say. It was as much as two years before, that he would not know me when he met me. It was five or six weeks before his death that Mrs. Cummings went there to take care care of him. It was a week or two before the funeral of Robert I. Campbell; a week or two I think. I think she moved his bed up stairs before she settled there. She had the house all cleaned, and then moved the bed up stairs. He used to go about the house when I was there, and up and down the stairs; he came down to his meals. I do not think he went out in the yard; don't remember of his going out.

*Re-examined in chief.* I can't tell whether my father staid there part of the time after George came up.

*George Campbell*, sworn for the defendant. (He is one of the heirs-at-law, and interested in the event of this suit. He is offered for the purpose of testifying concerning the loss of a paper; and was objected to.) I am the brother of Robert Campbell, deceased; and the father of George G. Campbell. I received a letter, in the spring of 1844, from Mr. George G. Campbell: I received two letters that spring from him. I don't know where

the one is. The one that I do know of is in Mr. Zabriskie's possession, at least I gave it to him. I don't know whether the one I gave to Mr. Zabriskie is one of those I received that spring or not: the other my son George took, himself; he never returned it to me; I never asked him for it: he took it two years ago last spring; after my brother's death.

*Cross-examined*, under protest. I fix the time that I gave that letter to my son George by the fact, that I moved over to Long Island some time in the fall after my brother's death, and the next spring I gave him the letter.

*Re-examined in chief.* This letter my son George took was shown to my daughter Ann Eliza, and my son Samuel, too.

*Miss Ann Eliza Campbell*, sworn for the defendant. (This witness was objected to, on the ground that she is interested in the event of this suit, under a deed of trust of their interest in the estate of the intestate, executed by her father and mother to Edwin Benedict.) I reside at Hackensack. Am a daughter of George Campbell, the brother of Robert. I resided at Chazy, Clinton county, New York, before my uncle Robert Campbell's death; my father and I resided there 19 years, as long as I can recollect; I was born there. I am in my 22d year. I know George G. Campbell; he is my half brother. I know his handwriting. I believe I have not seen him write. I have seen him at his house at his desk, writing. I was in the habit of seeing his correspondence with his father, since my recollection. I saw two letters written to him by George in the spring of 1846. I didn't see them in the spring of 1846, it was in the spring of 1844. ,(The counsel of complainant objected to any proof of the contents of the letter, on the ground that no notice had been given for its production, nor any efforts made to have the original produced.) I knew both of those letters to be in my brother's handwriting. One of them had something in it relating to the affairs between him and his uncle. Father handed that letter to George. I saw him do it; it was in our dining-room, at Glen Cove, Long

Island. I heard father and George talking low, to themselves, and I thought their conversation was about those two letters. Father rose from his chair and went into his bedroom and fetched out, as I thought, two letters. George met him at the door of his bedroom as he was coming out in the dining-room, and father handed him the letters. He went to the window, and the first he opened I was confident was this letter we are speaking of, because, the back of the letter there was a little piece torn off, and I saw it as George opened it. While George stood reading the letter I walked out into the kitchen, and stood opposite to him, and he appeared to open another one and look at it, and then he closed that one and walked away from the window, and I thought was going to hand father the letters, and I hurried on to the room where he was; and it appears that he handed one letter to father, for I saw father have one into his hand, and George put the other into his pocket. George went away from our house the next morning. I spoke to George twice about that letter, at his house, two years this present winter. One day, in his dining room, he got speaking about this claim he had against the estate, and I told him I shouldn't be satisfied until he showed me a letter he took from father; and he asked me what letter it was; and I told him it was one that was concerning uncle Robert's business; and he denied it, and said he hadn't such a letter. Then, again, I spoke to him about it down in his basement; I asked him about it, and told him I wished he would let me see the letter he took from father. He denied that he had taken it; and I told him that he certainly did, and told him the time and where. He appeared astonished, and wanted to know if I see it myself. I told him that I had, and some one else had seen it; and he wanted to know who else had seen the letter. I told him lawyer Woodward, at the north. He wanted to know how he came to see it. I told him that I handed it to him to peruse. He said, Well, there's nothing concerning uncle Robert's business into it. I told him that he knew better, there was. Then I asked him again to let me see it if he had it. And then he said, I suppose it's burnt up. And after that he said he knew nothing about the letter. My

attention had been called to that letter's being important. I read the letter, and thought that, if George ever fetched up a claim against the estate, that would prove that he had none; and I handed it to Mr. Woodward to see if he didn't think the same. He perused the letter some time, and then handed it to me, and said, Ann Eliza, you take care of that letter yourself, if may be of some great service to you some day. (The last clause objected to.) I took the letter to Mr. Woodward after my uncle Robert's death; and this occurrence took place after my uncle's death. I recollect most of the contents of that letter; I read it more than once; three or four times; I think four times. George, in that letter, after having written several lines of complaint against uncle Robert, he writes as follows: "Uncle told me that he wanted to have his accounts settled up before his death, and if I could persuade Sarah to sign off her dowry, and let him have the property to sell, he would afterwards lend me a little money, so that I could go into business and do something for myself and family. With great persuasion I got Sarah to sign off her thirds. He took the property and sold it; has pocketed the money, and now he refuses to let me have any; says that I owed him. To be sure I did owe him, but now he is paid, though, had I have known that he would not have advanced me the promised money, I would have held on to the property until I had other means to have paid him;" and then he speaks how very much dissatisfied his wife and his mother-in-law are with him. I saw my uncle Robert once while he was living; never but once to my recollection. After I come down from Chazy I saw much of my brother George: I spent the following winter at his house; most of it. I heard him speak of his attending his uncle during the winter preceding his death. I heard him speak of the condition of uncle Robert's mind during that winter. He said he was like a little child most of the time. He used to entertain me with his childish talk; that's the way he came to tell me how his mind was. *Question.* Do you know whether the letter with the piece torn off was the letter your brother George took? (This question was objected to by complainant's solicitor. The witness before making the answer, hesitated, and,

in making it, made one or two expressions of doubt.) Yes, I think so. Do you mean the one he put into his pocket? I think so. I saw the letter father took, the next day. I went to his trunk and found that one he handed to Mr. Zabriskie, some time since, and the other letter was not there. Those two letters were the only two letters that father had in his possession from George, that he received while we were at the north. I should know the other letter if I was to see it. (A paper purporting to be a letter from George G. Campbell, dated May 9, 1846, being shown to the witness, she says): This is the other letter, the one I found in my father's trunk. (It is marked *Exhibit Z, No.* 2, on the part of the defendant.)

*Cross-examined.* My father moved from Chazy to Long Island two years ago last September. I do not recollect the date of the letter which I think George took, except the year; it was in the spring of 1844. The letter which George took had no envelope; it had the part of the sheet which contained the superscription, the direction; the other one was but half a sheet. The piece torn off of the letter which I think George took was a corner piece torn off the back. I can't tell whether these two letters were the only ones from George in the spring of 1844 which I read at Chazy. The first time I came across these two letters was about a week after father came here, after my uncle's death. I found them in an old trunk of mother's. I saw the letter which I think George took, just after father received it, and read it then. I was sure that the letter which George took was the one of which I have spoken relating to my uncle's and his affairs by the piece which was torn out. The time when George got this letter was in the fore-part of the winter of 1847, I think; it may have been in the latter part of the fall of 1846, the same winter that I staid with George; I went shortly after that to spend the winter with George. As we left Chazy the 20th of September I think it was the latter part of August that I handed the letter to Mr. Woodward, about ten or twelve weeks before we moved; perhaps longer, perhaps shorter. I took the letter out from my mother's trunk when I showed it

to Mr. Woodward; he lived at Plattsburgh, about ten miles from where we resided. I expect the other letter was in the trunk. I laid them both in the trunk again. There hasn't a great deal been said about this letter since this lawsuit commenced. I have said very little to my father, and he to me, about it. I have written down once what I thought to be the contents of that letter. I did this by Mr. Woodward's directions. I neglected it for a long time after he told me to do so : it was only five or six weeks ago that I wrote it down ; it might have been a little longer. I could not repeat word for word what went before what I have repeated here. He commenced, I think, by telling how he come to let uncle Robert have the property, in what situation it had placed them ; I couldn't repeat it so as to make sense. There was something else in the letter besides what preceded what I have repeated, that I would like to repeat : I cannot repeat it so as to make sense ; it was concerning uncle Robert, how he had treated him ; and then there was a certain amount, several thousand dollars, set down in figures. As I thought, if I understood right, it was the amount he owed uncle Robert : I am not sure ; it runs in my mind so. I think this place where the figures were set down was before what I have repeated here. There was nothing in the letter which stated how much money uncle Robert was to let him have ; only a little money ; I am sure that is the way he expressed himself. He spoke afterwards, after what I have repeated here, as though he could have depended on uncle Robert's word ; and then he spoke how dissatisfied his wife and mother-in-law were. He said nothing besides that in the letter that I could repeat of any consequence. It was all about uncle Robert's treatment. He closes by talking very affectionately to father. He spoke, in the letter, as if it was on account of his taking some of his wife's property for uncle Robert to dispose of that his wife and mother-in-law were dissatisfied about. I was not living at home all the time my father was living at the north. I was living away from home the most of the time, at the town of Morris, fourteen or fifteen miles from my father's residence. I went home frequently. I was in the millinery business part

of the time; the other part of the time a little of anything, house-work and a sewing. I have written many letters in my lifetime. I think this paper upon which I wrote down what I remembered of George's letter is at home, somewhere about the house.

*William S. Banta,* sworn for the defendant. I was a law student in the defendant's office in November, 1846. (A paper purporting to be an account in favor of Robert G. Campbell against the estate of Robert Campbell, deceased, being shown to the witness, he says): This paper was presented to me at Mr. Zabriskie's office. Mr. Zabriskie was sick at the time, and the account was left on the 13th of November, 1846. I fix the date by a memorandum which I made on it at the same time. (It was marked *Exhibit Z, No.* 3, on the part of the defendant.)

*John C. Zabriskie,* sworn for the defendant. I reside in Hackensack. I was acquainted with Robert Campbell in his lifetime. I am, and have been for ten or twelve years, treasurer in the Bergen Turnpike Company. Previous to his death Mr. Campbell was President of that Company, for ten or twelve years, and until within two or three years of his death. He was a stockholder until his death. I was in the habit of seeing him every six months, and oftener at times. I always saw him twice every six months, and sometimes oftener. I last paid him his dividend. I think it was in February or March 1846. He was alone then. I did other business with him at that time. I was collector of Hackensack township at that time, and had a tax warrant against him. That tax was settled at that time. After I got in there and made known my business to him I didn't think him capable of doing that business. I told him I had some money to receive from him as also to pay to him. He said he didn't owe me any-thing. I don't think I succeeded in making him understand about the warrant. I got his signature on the dividend book, and left the balance coming to him, and left the room, and met Mr. Robert Campbell coming in, and told him I didn't consider his uncle capable of doing any busines, and told him what I had done. After I got through my business with him I made up an

opinion that he was not capable of doing any kind of business. I felt very unpleasant about having done the business that I had done with him. He had been in the habit of paying the tax on the Bull's Ferry property, for which this tax warrant had been issued. I hardly think I made him comprehend before I left for what property this tax was due. He did not count the money. After getting his signature I laid down the balance, but I don't think he understood the amount of it, the value of it. If I had not had his signature in the book, I don't think I would have left the money there. The difference between his intellect then and what it had been in former years was very much marked. I have nothing in my book by which I can fix the date. The tax warrant was issued about the 1st of January; it was before the Town Committee met, which meets the week before the town meeting in April. The old man was in the back room down stairs; there was a cot in the room. He was sitting up when I went in. I didn't know anything of his sickness that winter. I am certain this was in 1846.

*Cross-examined.* I made him understand that I was treasurer of the Company, and the dividend that was coming to him. I don't think he made any attempt to count the money. I don't think I showed him the tax warrant, for I found I could not make him understand. He knew me. I think he recognized the fact without difficulty that I was treasurer of the Turnpike Company. I can recollect no particular remark, no particular thing that was foolish or childish. There was not much said; very little: I couldn't make him comprehend. The dividend was what it had ordinarily been on former occasions. There were servants in the kitchen. I saw no other persons besides the servants and Robert Campbell, Jr., that resides in Hackensack. The property on which this tax was due was property which I considered he was trustee or agent for; trustee or agent for a Mrs. Miller. I had not much difficulty in making him understand that I had a dividend for him.

*Re-examined in chief.* Mr. Campbell was very particular in

giving and taking receipts, very much so before this time. I think he was more so than persons I have generally done business with. He was very particular about the money he received, whether it was bankable or not. It was always his habit to count the money. On this occasion he did not either count the money or notice what bank the money was. The amount of the dividend was eleven dollars. I think the tax was between four and five dollars. There were two or three bills in the balance I paid him.

*John H. Ackerman,* sworn for the defendant. I live at Pollifly, about three-quarters of a mile from Mr. Campbell's old place. I did not work any of his land on shares during the latter part of his life, although I had made an arrangement to that effect with him. I made this agreement with him in the spring of 1846, either the latter part of April or the first of May ; it was before corn planting time. In the first place George G. Campbell and Mr. Gould were after me to take Mr. Campbell's place on conditions. I called in one day, and George was there. We went over the lots and examined them ; and then we came back, and old Mr. Campbell, (Robert,) was in the house at the same time, and we talked over upon what conditions I would take them. I told them how I would take them, and we was all agreed, old Mr. Campbell, young George and I. I told them I would n't take them unless it was all down in writing how I was to do it. Young George was to make it out in writing, and I was to call in a few days again. I did so ; and when I called in again, old Mr. Campbell said there was no such thing as the thing we had agreed upon a day or few days before ; I was n't going to have his place on those conditions any how. Well, says I, Mr. Campbell, I am very well satisfied : I ain't going to have anything to do with it now : and that's all I told Mr. Campbell. Then said young George to me, he's so childish he don't know what he talks from one day to another. It was n't over between three, four or five days that intervened between the time I first went there and the second time I went there. This difficulty seemed to proceed from his forgetting what had taken place. Young George asked him if he did not remember what they had

talked about a few days before; and he said, what day? There was no difference between George and me in our recollection as to what had taken place. I have lived where I do now 36 years, on a farm I own of about 145 acres. I am 45 years old. From these conversations I had with Mr. Campbell I did not think he was competent to transact business. I wouldn't have wanted to transact business with him myself.

*Cross-examined.* The day I was first there Mr. Campbell seemed to understand the bargain, and took part in the conversation; what he said at that time seemed to be rational; it seemed so to me. The terms of the agreement that I was to work the farm was, that it was to be upon halves; half of every thing he was to have, and bring his own in. Manure was talked about. I said I wasn't going to manure other people's land. Mr. Robert Campbell said there was some manure about the barn : I could have that. He said I ought to find some manure. He seemed to understand his interest in making the bargain. The main difficulty between us seemed to be that he wanted me to bring in his share; and I said I hadn't been used to do that. He said his land was in good order. He said I ought to bring in his share. When I talked about putting corn in he said his land was in good order. Those lots were in good order in point of fact : I think they would have made a pretty good crop. We did not differ about any other part of the bargain. This was one point of the bargain that he excepted to the second time I called, that he wanted me to bring his share in, his corn and the like of that; and I think, besides, that he said that I wasn't going to work his farm. He knew me both of these times I went to see him. Mr. George Campbell told him John Ackerman was there, came to see him about working his farm. I don't know of any case where it is common for the lessee to find part of the manure when they take it on shares. There is a meadow with Mr. Campbell's farm. On the first day, I advised him to sell his stock and let me have the meadow, and then I would bring in his share; and he said he wasn't going to sell off his stock, he wanted his hay for his own use.

*Re-examined in chief.* Young George and I had agreed upon the bargain out of doors, and then came in and told him the terms, and then the old man said I ought to bring in his share. The reason why I would n't take it unless it was all down in writing was, that I had had some dealings with him myself, and I knew how forgetful he was, how contrary he would be some times. I had some conversation with George before we went in, and he said he was so childish he did n't know how to look after his farm or to attend to his business ; and that was another reason why I wanted it down in writing. He told me this the same day, while we were walking over the farm, before we went in to see the old man. The second time I was there the old man did n't seem to give in when George tried to persuade him to let me have it. George went up to him and told him the bargain, and he was right away so contrary that I did n't want to trouble myself any more about it.

*Re-cross-examined.* It was a year or so before this that I had had business with him ; sold little articles or so to him. It seemed that he had forgotten about some articles that I had sold him ; I suppose it was two or three years before this that this happened. All I know about Mr. Campbell's being difficult to deal with, and stubborn, was what I had heard talked about. I guess I have heard that talked about for several years before his death.

*Re-examined in chief.* What I mean about what I had heard about his being difficult to deal with, and stubborn, was, that he was childish.

*Re-cross-examined.* I mean that George and I talked over the terms upon which I would take the farm : not that we made any bargain ; we had to get Mr. Campbell's consent first. I believe he understood everything the first day I was there. If he had been a stranger to me, I saw nothing the first day I was there to induce me to believe but what he was competent to make a bargain for himself.

Jan. 13, 1849.  *Robert S. Gould*, sworn for the defendant.  I
reside at Hackensack, and do business in New York.  I have
lived at Hackensack since 1834.  I married a niece of Robert
Campbell, deceased, a daughter of George Campbell, Louisa;
her father is living.  My wife is an own sister of George G.
Campbell.  She was brought up in the family of Robert Camp-
bell from the time she was a child four years old, and lived there
until she was married to me.  From 1835 to 1842 I lived oppo-
site to Mr. Robert Campbell.  During this time I was more in-
timate with him than any other of his relatives, I think; I did a
great deal of business for him.  Adolphus was intimate with him,
too, I think, and was there often.  I think I was as intimate with
him as any of them.  I saw him during the last year of his life
almost as often as I came home; I almost always went to see him
as often as I came home: had, generally, something to get for
him.  I recollect his sickness during the winter before he died;
saw him during his sickness as often as I came up, and stayed
with him during his sickness to relieve George.  When I came
up I slept there, stayed there all night.  I think in presence of
George, I asked him whether he had made his will.  He said he
had not.  And then I saw his mind was so unfit for business I
didn't say anything more about it.  This was just after his ill-
ness, so that he was out of bed and sitting up.  There was
something said in presence of George about his making a will;
whatever was said was said in presence of George; there was
not much said; and when I named it the old man said, once or
twice, "write one, write one;" but it was said in that child-like
manner that I considered him quite a child.  I considered him
at that time no more fit to make a will than a child; totally unfit
to make a will or to attend to any business.  *Question :* Did you
come to any conclusion among yourselves as to his competency to
make a will, and did George take part or concur in that conclusion?
Yes; at least I thought so myself; and I thought it was under-
stood by George and all of us that he was incompetent to make a
will.  *Question :* Was it then thought, by George and all of you,
that it was desirable that he should make a will if competent to
do so?  (Objected to as leading.)  Yes.  *Question :* Was Rob-

ert Campbell, at any time after that sickness, in your opinion, capable of doing business understandingly? No; and I didn't think he was capable for two, three or four years before that; and I will tell you the reason : he often had business to do, and money to count over, at his office, and would ask me over to count his money, and he would most always get it wrong, that is, the money. He would have it his way, and I would have it my way, and he would get angry and say, " well, have it your own way." We most always had a little spat about it, and it would finally wind up by his getting in good nature. The general result in those cases was, that I had it my own way. Still, before this time, in conversation he was rational; but in business, when you came to figures and money matters, for three or four years before that, I don't think he was competent. It was his habit ordinarily to get in these little pets about something or other. On these occasions I did not get angry at the old man : I would be, perhaps, for a moment, but when I would reflect a moment that he was an old man I would lose it. I always thought him an honest man; he meant to do what was right. He was always arbitrary and overbearing. In his time, when he was himself, he was the most particular man about his business I ever knew. He was the most particular man about taking receipts I ever knew; always took receipts for the smallest amount. *Question:* At this time, the time of his sickness, did you see any amount of money lying around his house carelessly? No, sir. While he was sick there, I was up most of the week, and was in there two or three times besides the twenty-four hours I have mentioned before. Adolphus and George were present. What was said by them I don't recollect in order to have the trunk opened, but it was opened in the presence of the old gentleman. Some rent had been collected, so Adolphus and George said, from Paterson. Some one asked for the key. He objected at first, said he wouldn't let them have it. Finally he gave it up. He always carried it in his pocket. I can't exactly distinctly recollect now whether he consented or not to its being opened : at any rate it was opened, and there was some money in it; there was some bills, most, I think, the People's Bank at Paterson, rising $100

in the pocket-book. There was, I think, two or three gold pieces, in a purse. He looked at it, but seemed to look as though he didn't know what was going on; looked like a child. Something was said about there being one or two gold pieces missing: who said it I don't recollect; and either Adolphus or George said, there was a bar of gold in that trunk; but it was not found. The trunk was then locked up, and the key given back to him. That was all the money I ever see about the house, and that was n't careless. He appeared to be very cross at that time towards Adolphus. *Question :* Was you not there when he was asked if he would not put his valuable papers in A. O. Zabriskie's hands? Yes, I recollect that. *Question :* Do you recollect of his money being counted at that time? I recollect something of it, but it is very indistinct. *Question :* Did he seem to know, after his illness in December, 1845, what amount of money he had in the house? I don't think he did. *Question :* Do you know whether he was able, after that illness, to tell the value of money so as to be able to tell a half from a quarter dollar? No, I should think he was totally incapable of doing business, of counting money, though I never saw him count money after that. I don't think I ever saw a man so totally unfit for business as the old gentleman was after that illness, at the time of his sickness and after. Before his sickness I have heard him say that a half dollar was a dollar. No, I would tell him, that's a half dollar. Oh, yes, so it is. Before the old man's death I was in the habit of seeing George Campbell frequently : he visited my house, and I visited his. *Question :* Did you ever hear him say after the sale of the Broadway and Mercer street property whether the old man owed him anything or not? Never heard him say he owed him anything. I heard him say that he had sold it, and had got the money, and had promised to lend him some to go into business with. He was very much put out about it, and so was the whole family, that he did n't. I never heard of his owing him until the commencement of this suit. (This last sentence objected to.) *Question :* Did you hear George complain of the old man's not lending him this money more than once? Yes. *Question :* Did you ever hear the old man and

George together talk over the situation of their accounts? I heard the old man, before the sale of the property, tell George he must have his money. I don't think after the sale I ever heard them talk together about their accounts. *Question :* How long before the sale of the property did you hear *this,* shortly or long before? I can't tell the time; it wasn't a great while, though. *Question :* Can you fix any time, one, two or three years? A year or less. *Question :* What was George's reply at those times when he said he must have his money? Well, that he would sell it as soon as he could, that he wanted to pay him. And he has told me he wanted to pay him, when the old gentleman was not present. *Question :* Did George, while he stayed there, transact the old man's business? Yes; that is, what I mean, paying some of the servants: I was present when he paid one: I don't know what other business he did. Four several papers, purporting to be receipts, and one, an agreement, were here shown to the witness, and he says they are, the body of them, in the handwriting of George G. Campbell; he knows his handwriting: has seen him write frequently; don't know the handwriting of the signatures. The names correspond with the names of the servants the old man had at that time. The indorsements on the receipt, except the upper indorsement on Catherine's receipt, are in George's handwriting. (The said receipts and agreement are marked *Exhibits Z, Nos.* 3, 4, 5 and 6, on the part of the defendant.) Two other papers, purporting to be receipts, were shown to the witness, and he says the handwriting and body of those receipts are in George G. Campbell's handwriting. Another paper, purporting to be a note for $450, dated Sept. 10, 1835, being shown to the witness, he says, the signature to that paper is in George G. Campbell's handwriting. Another paper, purporting to be a receipt from Mary Anderson, dated July 12, 1844, being shown to the witness, he says, the body and indorsement of that paper are in Mr. Robert Campbell's handwriting. I have seen John Kennedy write, twice if not oftener. I think the signature "John Kennedy" to that paper as a witness is in John Kennedy's handwriting. John Kennedy was a hired man to the old gentleman. (Another paper,

purporting to be a receipt from T. B. Bleecker for $100, dated Aug. 5, 1844, being shown to the witness, he says :) the indorsement on that receipt is in the handwriting of George G. Campbell. (Another paper, purporting to be a receipt for $25, dated May 15, 1844, being shown to the witness, he says :) that paper is in George G. Campbell's handwriting, the body and signature both. (Another paper, purporting to be a receipt for $50, dated May 21, 1844, being shown to the witness, he says :) the signature to that paper is in George G. Campbell's handwriting, and I think the *body* is too. The endorsement on it is Rob't Campbell's handwriting. (*Exhibit Z, No.* 2, being here shown to the witness, he says :) that paper is in the handwriting of Geo. G. Campbell, the body and signature both. (Nine several papers, purporting to be letters addressed to Robert Campbell, from George G. Campbell, were here shown to the witness, and he says :) those letters are in George G. Campbell's handwriting, body and signatures. (These several letters are marked, *Exhibits Z, Nos.* 14, 15, 16, 17, 18, 19, 20, 21 and 22 ; and the several papers, receipts and notes before shown to the witness are marked, *Exhibits Z, Nos.* 7, 8, 9, 10, 11, 12 and 13, on the part of the defendant ; the same being now offered in evidence by the defendant.) The memorandum on the back of *Exhibit Z, No.* 15, is in Robert Campbell's handwriting. (The defendant here showed to the witness a paper purporting to be a deed of assignment, dated July 7, 1834, and the witness says :) The signature to that deed is in George G. Campbell's handwriting ; and the schedules to it, and the signature to the schedule, are in his handwriting also. (The said deed is marked *Exhibit Z, No.* 23, on the part of the defendant.) (Eight several papers, purporting to be accounts being George G. Campbell and Robert Campbell, being shown to the witness, he says :) The accounts, the bodies and figures, are in George G. Campbell's handwriting. (*Exhibits Z, No.* 25, 26 and 28 being shown to the witness, he says :) The ink indorsements on these Exhibits are in Robert Campbell's handwriting. (The said papers purporting to be accounts were offered in evidence by the defendant, and are marked *Exhibits Z, No.* 24, 25, 26, 27, 28, 29, 30 and 31, on the part of the defendant.) While I was there George gave orders about the

house to the servants as though he was head of the house.   Mr. Robert Campbell was sick at the time.   I believe he collected some of the rent at Paterson, mentioned before.   (The complainant's solicitor here objected to the several Exhibits made in the course of the examination of this witness, as well for the insufficiency of the proof of the handwriting and execution, as to their competency and relevancy in the cause.)

*Cross-examined.*   I have no interest in the right of my wife in the estate of Robert Campbell.   George Campbell, my father-in-law, owes me and my partner $500 or $600.   My wife has no interest that I know of in the share of George Campbell in the estate of Robert Campbell, deceased, by virtue of a deed of trust, executed by George Campbell to Mr. Benedict: I have never examined the deed of trust.   I can't say whether the right of George Campbell by that deed of trust is not vested in the children of George Campbell.   I think Mr. Campbell was taken sick, at the sickness spoken of, in December, 1845; but it was in January, 1846, before I came back: I had been out west. He got better in February or March, so that he was up and about the house.   When I asked the question about his making his will was in March, I think; I can't tell what part of the month : I can't fix any definite conversation just now, anything that he said, besides what I have mentioned in my principal examination, that made me think him incompetent.   He said but little ; was very deaf.   I judged by his looks as well as by what he said.   He acted like a child is the nearest comparison I can get to it.   He was some better after his sickness and before his death.   I do not know that he was insane or delirious during his sickness.   I am confident that I never said he was competent to make a will after his sickness, that is after he got about.   *Question.*   Was it not proposed by you, or in conversation between you and Robert Campbell, Jr., and Adolphus Campbell, or one of them, that Mr. Zabriskie should be employed to draw a will for Mr. Campbell ?   I believe there was something of that nature took place : I believe Mr. Zabriskie was asked.   I was present at one time, and only once I believe, when it was pro-

posed to Mr. Campbell that Mr. Zabriskie should be employed to draw his will; and he objected to it. Mr. Zabriskie was present, I think. I cannot say by whose request or procurement Mr. Zabriskie was there, but I think it was at my request and Phœnix Campbell. This was after he got out of his bed and was about the room. I think Dr. Howitt was present at that time, besides. This was the only occasion that I know of that it was proposed that Mr. Zabriskie should be employed to draw his will. On reflection I think it was Dr. Howitt, instead of Mr. Zabriskie, that was present at the time I have just mentioned. I believe Mr. Campbell did state, in some conversation about his making a will, that he could write his will as well as Mr. Zabriskie. I don't know that Mr. Campbell, after it was ascertained that he had no will, was importuned to make his will, more than what I have mentioned. When he said, as I have mentioned, " Write one, write one," he didn't seem to be disturbed or nettled. My impression is, that George G. Campbell said, during this sickness of the old man's, that he was incompetent to make a will; I won't swear positively. If he did say so, it was at the time of these conversations about his not having a will; this was after his sickness, after he got out of bed. I can't say that I ever heard George G. Campbell say, during the sickness or afterwards, that he wished or desired that his uncle Robert should make a will. Mr. Campbell managed his own business for three or four years previous to his sickness; paid out and received his money, when he had money to pay out and receive. I don't know of his having any agent to attend to his business before his sickness in December, 1845. I don't know of any person but myself who attended to his business before his sickness. I went to Mr. Riker for him, and other places in New York; dont recollect exactly every thing. I attended to the paying off of a mortgage on a house at Newark, and collecting rents for him from that house at Newark. I almost always had something to do for him. The time when I paid off this mortgage was four or five years before his death. He furnished me with the money to pay it off. I received the rents for the property in Newark from the time he got possession of it until

his death. I don't understand enough about the business with
Mr. Riker to state any of the paaticulars; I was only employed
to take messages and letters to him. I went to Somerset for
him, about five or six years before his death. I think he prose-
cuted the suit for this place in Newark in his own name as at-
torney; and I think Mr. Van Arsdale attended to it for him. I
can't say upon whose suggestion it was that this idea of looking
into the trunk was started. I know it wasn't upon mine. I
think it was Adolphus that said there ought to be a bar of gold
in the trunk. I can't state anything that Mr. Campbell said to
Adolphus at the time he seemed to be cross towards him, at the
time of opening the trunk. He called him Suydam sometimes.
I thought he referred to the New Brunswick tragedy. The in-
cident of his calling a half dollar a dollar occurred in my pres-
ence more than once. In counting the turnpike money there
was a good deal of change; and I have known him, I think, to
call a quarter of a dollar a half, and a five franc piece a dollar.
It was in counting the turnpike money that I was called in to aid
him, principally; I have been called in to help him count other
money too. It was three or four years before his death that I
have noticed this inaccuracy of his in counting money; it might
have been longer than that. The way he come to have charge
of the turnpike money was that he was President of the Com-
pany. He received it from the toll-gatherer. I think Mr.
Campbell made contracts with his servants before his sickness as
to their wages and the rate of their wages. I was frequently
called before that to witness payment to them for him. He
managed his farm himself, but it was managed badly. I
think I have heard George G. Campbell say, with reference
to the money which the Broadway and Mercer street property
brought, both ways, that his uncle promised to lend him, and
to let him have money. I think I am certain I heard him say
that he promised to lend him some of it; but, if he said that
he promised to let him have some of it, I understood it that
George understood it as meaning to lend it to him. I had no
idea that he owed him anything. I don't recollect whether this
conversation where Mr. Robert Campbell told George he must

have his money took place at George's house or at Robert Campbell's office. George G. lived then in the city of New York. That conversation was before the property was sold. I think it was within two years before the property was sold. I think it was sold in 1843 or 1844. What makes me think so is, that, after it was sold, the old gentleman came to my store, staid all night at George's, and went home the next morning. It was after I went to New York, and I think it was not the same year I went down. I am not positive of hearing this said to George G. Campbell, that he wanted his money, more than once; I am positive of it being said once. He said, the money he owed him. George, he said, you must sell that property on Broadway, I want my money. I have heard, I think, George say more than once, that he wanted to pay him, or that he would sell the property as soon as he could. If I heard him more than once it was when George and me happened to be in conversation; I can't tell the particulars that led to this conversation; we used to meet together; visited together; and he would talk about it, that he wanted to pay him off. My habit of visiting Hackensack is to go up once a week or once a fortnight. That was my habit while Mr. Campbell was sick. I do not know how long George G. was there that winter taking care of his uncle; nor at what time Mrs. Cummings was there taking care of him. I was out west then. I didn't get back until after Mr. Campbell's funeral. I never saw Mr. Campbell out beyond his yard after he got better, I never saw him out more than once. I came up Saturdays, and spent Sundays there; that was my habit. When I was called to witness payments to the servants it was because they couldn't write their names.

*John I. Jenkins,* sworn for the defendant. I was acquainted with Robert Campbell, deceased, from my earliest recollection until his death, having frequently seen him at our house when I was a boy, and having had business to do with him. I have also been acquainted with George G. Campbell ever since I was a boy. He was in my father's employ, and afterwards married my father's sister. I am now 35 years old. I was called upon

by George G. Campbell to appraise the furniture in his house, and I attended, with another person, and appraised the furniture. And I was afterwards, with my grandmother Hannah Jenkins, at the office of John L. Riker, Esq., who, I presume, was Mr. Robert Campbell's attorney, and the sale of this furniture was talked about; but I am not sure it was consummated in my presence. I don't remember the date of this transaction, and I do not know the purpose of the sale. I do not know at whose request the sale was made. I think a bond was signed by my grandmother to Robert Campbell for $1,000, at Mr. Riker's office, at that time: I think that was the sum; and that was the consideration of the sale of the furniture; but I am not positive that a bill of sale was given then. I know of no other security given for the price of the furniture; and I do not know whether that has been paid or not. I have not paid it. I know nothing what has become of the said bond, nor where it is: it is not, and has not been in my possession or under my authority. There was a bond for $2,500 to Hannah Jenkins, executed by George G. Campbell and Robert Campbell; I can't remember the date; I think it was in 1846 or 1847; it was given in the city of New York; I don't know that I noticed the date. It was given for money advanced by Mrs. Hannah Jenkins to George G. Campbell, I think; but I only think so from information derived from others. It was given for money advanced by Mrs. Jenkins at the time the bond was given, (she borrowed the money from the Insurance Company for the purpose,) and not for any former debt. I don't know, except from hearsay, whether it was advanced to George G. or to Robert G. Campbell. A part of the amount of this bond has been paid: I don't recollect distinctly how much. On examination I find that the bond is dated June 10th, 1846, and that the payment made thereon is $800, paid February 1, 1847. I do not remember who made the payment. The letter marked R. C. No. 2 is in the handwriting of my brother James W. Jenkins, and is signed by him I think. I never paid any money for Robert Campbell to any one on any account.

*Hannah Jenkins*, sworn for the defendant. I knew Robert

Campbell, now deceased, a good many years. I have known George G. Campbell ever since he was a little boy. He married a daughter of mine. Robert Campbell did, in his life-time, sell to me goods or furniture held by him as assignee of George G. Campbell: I do not recollect the date. The purpose of the said sale to me was for the said George G. Campbell's holding these goods for the benefit of my daughter Sarah Campbell. The sale and purchase were made by request of Robert Campbell. He advised me to buy them, and said I should never be called upon on that account. I don't know as there was any price set for the furniture. There was no time set for the payment. There was nothing about interest as I recollect; I don't recollect about it. The price was not paid: I never paid nothing. I don't know anything about it's being to be paid in cash. It was not secured by any note, bond or other security: I don't recollect anything about any bond or note, or any payment. No such bond or note is or has been in my possession; and I have no recollection of any payment upon any such bond or note. I have never paid any money or check in behalf of Robert Campbell for any debt of George G. Campbell.

*Cross-examined.* Robert Campbell did not state to me what was his object in effecting said sale; nor did he say anything in relation to his having been paid the amount of the indebtedness of George G. Campbell to him.

*J. Douglas Woodward,* counsellor at law, of Plattsburgh, New York, sworn for the defendant, saith: he is personally acquainted with George Campbell, formerly a resident of Chazy, New York, and now a resident of Hackensack, New Jersey, and have known him for more than nine years last past. He is the reputed brother of Robert Campbell, late of Hackensack deceased. I have no personal acquaintance with George G. Campbell of New York but know him by reputation: he is the son of the above named George Campbell. I received a letter from the said George G. in 1846, which is annexed to this my deposition. I know the handwriting of the said George G. Campbell, having

corresponded with him, and frequently seen letters addressed by him to his father, and received one from him in April, 1847, which is hereto annexed, dated March 30, 1847, which letter I believe to be in his handwriting, without any doubt.   Soon after the death of Robert Campbell, late of Hackensack, and during the summer or autumn of 1846, I was at the log cabin of George Campbell in Chazy, having called there at his request, and was shown several letters purporting to be in the handwriting of the said George G. Campbell.   One, in particular, was shown me by Miss Ann Eliza Campbell, a daughter of said George Campbell, which struck me as an important letter in case the said George G. Campbell should set up a claim to any portion of the estate of said Robert Campbell, deceased ; and I advised that the letter be kept.   This letter and its contents has been the subject of conversation between Miss Campbell and myself, since that time, and we agree, I believe, as to its contents.   It was dated in the spring of 1844, and, after making some complaint against said Robert Campbell, the said George G. Campbell continues in substance as follows : " Uncle said he wanted his account settled before his death, and if I would persuade Sarah to sign off her dower, and let him have the property, he would lend me money so that I could go into business, and do something for myself and family.   With much persuasion from me Sarah signed off her thirds.   He took the lots and sold them, has pocketed the money, and now refuses to let me have any, and says that I owed him.   It is true I did owe him, but now he is paid.   Had I known that he would not advance me the promised money I would have held on to the property until I had other means to pay him." The circumstances under which that letter was shown to me made a distinct impression upon my mind ; and I recollect saying to Miss Campbell and her father, that from the conduct of the said George G. Campbell I should not be surprised if he should make a claim against the estate of his uncle, and if he should, the letter would be useful to prove that he had none at the time of its date.   The letter was retained by Miss Ann Eliza Campbell, or her parents, and I have not seen it since.   I have reason to believe that the same was sub-

sequently obtained, at Glen Cove, in 1847 or 1848, from the house then occupied by said George Campbell, and is now in the possession of said George G. Campbell or has been destroyed by him. I know that, for many years, the said George Campbell lived at Chazy in destitution and poverty, and that, after his brother Robert's death, instead of going to Hackensack to take possession of his estate, he was located, in 1846, at Glen Cove, in the State of New York, and was not removed to Hackensack, New Jersey, until the next season. I have visited the said George Campbell at Glen Cove and at Hackensack.

*Cross-examined.* I know Samuel H. Campbell. He is a son of George Campbell, and is named as such in the deed of trust executed by George Campbell and wife to Edwin Benedict. The assignment in trust to which I refer shows whether said Samuel has any, and what interest in the event of this suit. Ann Eliza Campbell is the sister of the said Samuel, and named in said deed of trust as one of the children of the said George Campbell. To that I refer as to the nature and extent of her interest, if any, in this suit. I am attorney for Edwin Benedict, trustee of George Campbell and others, in a suit now pending in the Supreme Court of the State of New York, against Robert G. Campbell, the complainant in this suit, and George G. Campbell. The suit is voluntarily prosecuted by me as attorney for Mr. Benedict, trustee &c., for the purpose of setting aside, on the ground of fraud &c., a certain mortgage for $5,000, dated in August, 1846, executed by the said George G. Campbell to the said Robert G. Campbell. My services in that case are gratuitous as far as the personal responsibility of Mr. Benedict, the trustee, is concerned. He has agreed, however, that my reasonable costs shall be paid out of the estate committed to him, should there be sufficient for that purpose. If there be not sufficient, I give my services for the benefit of George Campbell and his family. I have also received assurances from the said George Campbell and his family that I shall be paid for any services I may render them in their business. I related the circumstances of the letter to Mr. Zabriskie, and either offered to

make my deposition as to its contents or he proposed to take it, and who made the first suggestion I don't recollect. The facts, however, within my knowledge in regard to the letter of George G. Campbell were first communicated by me to Mr. Zabriskie. I have no contingent or other interest in this suit, unless the terms above mentioned, upon which I act as attorney in 'the cause in New York, create such an interest.

*Walter F. Williams,* sworn for the complainant. I reside in Bull's Ferry, Bergen county; have lived there five years next spring. I am a farmer and kitchen gardener. I knew Robert Campbell, in his lifetime, of Hackensack. I remember about the time he died; I think it was about July 3, 1846. He died in the July after I paid him some money in February preceding. I was acquainted with Mr. Campbell a little over a year before his death. I was a tenant of some property under him, at Bull's Ferry. It was a farm without any improvements. He had charge of this property for Mrs. Miller; he told me he held it as trustee for her. I became tenant of this property, under Mr. Campbell, April 1, 1845. I made a bargain with Mr. Campbell for it, and took it from him, under a written agreement for one year. This agreement was drawn up and prepared by Mr. Campbell, or George Campbell, I think wrote it; but the signature thereto was by Mr. Robert Campbell, and in his handwriting. I think this writing has been thrown aside. I think have looked for it but am unable to find it. I paid the rent of this property to Mr. Robert Campbell, afterwards. The arrangement as to the time of payment of rent was, that it should be paid quarterly in advance. I paid Mr. Campbell the first quarter's rent upon receiving the lease; the second quarter, July 1, 1845, as appears by a receipt in my possession; the third quarter, the 3d of October, 1845; and the fourth quarter of that year, the 9th of February, 1846. A paper writing, purporting to be a receipt, signed by Robert Campbell, dated July 1, 1845, for $17.50, being shown to witness, he says: I received that paper writing from Mr. Robert Campbell. The body of it is in said Robert Campbell's handwriting; I saw him write it

and sign his name to it. Another paper writing, purporting to be a receipt, signed by Robert Campbell, dated October 3d, 1845, for $17.50, being shown to the witness, he says: that he saw Mr. Robert Campbell write and sign the receipt. He received and counted the money, at that time, for which this receipt was given. He was very particular to count the money. Another paper writing, purporting to be a receipt of Robert Campbell, Sen'r, dated February 9th, 1846, for $17.50, being shown to the witness, he says: I saw him write his name to the said receipt. The body of the receipt is in the handwriting of George Campbell. He wrote it by the directions of Robert Campbell. Mr. Robert Campbell was sick at that time, sitting by his table at breakfast. He dictated to George the form of writing the receipt: it is written different from the rest. He directed that the receipt should not mention for what quarter's rent it was given, but that it was for a quarter's rent. Mr. Robert Campbell was in the room, it was pretty dark. I said, How do you do, Mr. Campbell? He said, I am pretty frail. He said, you need not have come down upon me in this way, you ought to have given me notice. I said to him, I have come to give you some money, Mr. Campbell. I then told him I had come to pay him the rent of the place at Bull's Ferry; my son was with me. He then requested us both to sit down. I then took out the money and handed it to him; $17.50, I think. George Campbell took up the money and counted it over to Mr. Robert Campbell. Mr. Robert Campbell then ordered George to take a box from underneath the bed. Robert Campbell had the key of the box in his possession. He gave George the key, and ordered him to open the box and put the money into a pocket-book. George took the money, and put it into the pocket-book; and he ordered George to put the pocket-book in the box again, and to return the box to where it was, and the key to him; and George did so with the box, and put the key into Robert's pocket. I then wanted to know of Mr. Robert Campbell about hiring the place for another year, and how it was going to be. He said he did not know any thing to hinder us from having it another year. My son was to have the place the next year;

this was agreed between my son and me. There was no further agreement at this time between Mr. Campbell and us; we were to see Mr. Campbell again. I paid no more to Mr. Campbell after that. I paid the rent of the place, at the same rate, to Mr. A. O. Zabriskie: I never saw Mr. Campbell after I paid him the last quarter's rent as above mentioned. . In the transaction of the 9th of February, 1846, above mentioned, Mr. Campbell seemed to understand himself, and to understand the business he was transacting, perfectly. He did not seem to be any wise incompetent to transact the business then doing. He seemed to understand himself, and the orders he gave; and they were in perfect accordance with what was doing. He appeared perfectly to recollect the amount of money I was to pay him. I paid him the rent above mentioned on the 3d of October, 1845, at his house. Robert Campbell, Jun'r, went with me. I think he was in bed, and that he got up; and I paid him the money either in the parlor or back room or office. He seemed competent to do the business I had with him; all the money transactions I had with him he seemed competent at the time to do. I had no other with him except those above mentioned. In the month of July, when I paid him the rent, I had two ladies with me. He seemed very spry, and he took them into the garden and gave them some flowers, and into the parlor and gave them and witness a glass of wine; and he said he wished he had married when he was twenty-five years of age. I found nothing to doubt his capacity to do business in all I had to do with him. (The paper writings mentioned in the examination of this witness are marked, in the order of their dates, *A*, *B*, *C*.)

*Cross-examined.* I did not know Mr. Campbell until I rented the property from him. He made the bargain with me : George was not there. I had not seen George before about it. By appointment in Hackensack I met George in New York, and got the lease, and paid him the quarter's rent in advance. This appointment was made with Robert Campbell when I first saw him. I never saw Mr. Campbell except the four times above mentioned. He once wrote me a letter for rent I had paid him. I

think it was the October rent. I paid him the rent on the 3d of October; and I think it was the 7th of October I received the letter requesting my attention to it, that I had overlooked its payment. I think the letter was dated on the 7th. (The evidence about the letter was objected to by complainant's counsel after the evidence was got out.) He did not mention exactly any reason why he dictated the last receipt different from the others; but he told me at the time I paid the rent before, that there was some difficulty about Mrs. Miller's business in New York; but he stated no cause at the time of the last receipt.

*Re-examined in chief.* After I made the bargain in Hackensack, with Robert Campbell, I did not see George Campbell in relation to the matter, and had nothing to do with him about it, except to receive the lease from him as stated. When George brought the lease to me in New York it was signed by Robert Campbell. The lease was exactly agreeably to the contract and bargain I had made with Robert Campbell. It was a pretty long document; about two pages, I think; I thought it long for a lease for one year. The last receipt given by Robert Campbell to me, mentioned above, was read aloud by George to Robert Campbell, and Robert Campbell signed it.

*Re-cross-examined.* When George went to open the box he took the key out of Robert's vest pocket. Robert requested him to do it.

*Edward Dawson,* sworn for the complainant. I have lived in Hackensack forty odd years. I knew Robert Campbell in his life time, ever since he lived in Hackensack; was well acquainted with him. I had some business with him the last year of his life. I follow tailoring business. The first part of the fall of 1845 was the first work I ever did for Mr. Campbell. He came to me to get me to do work for him. I had lived up town, alongside of Mrs. Gould, Mr. Campbell's niece. I moved down town, and lived in Mr. Robert Campbell's house, the old gentleman's nephew, that's near where he lived. He then came over to my

house with some small jobs of work. I then done that work for him, and I took it home, and he asked me for the bill, and, says he, that's cheap enough, and counted me out the change, and gave me ten-pence over my job of work. The next work I done for him was a pair of pantaloons which he bought in the village, and repairing an overcoat and a vest. He then told me, when I took the work home, he had no change, and then asked me if I would take a twenty dollar bill and get it changed in silver for him. I took that to Robert's, that's his nephew. He couldn't change it, and I then took it to Mr. David Terhune's, and got it changed there. I took the change to Mr. Campbell, and gave it to him; and he paid me out of it, counted it himself, and made the change right; no difficulty in making out the change; none at all. The next transaction was, Mr. Campbell's applying to me to make him a pair of cassimere pantaloons. He asked me to go with him to see Mr. Demarest about the pantaloons; it seemed that he took a fancy for me to go with him to the store. Mr. Demarest was to get a pair for him like the pair he, Demarest, had on; and Mr. Campbell requested him to get him a pair like those he, Demarest, had on; and Mr. Demarest told him he was going down in a few days. When he came back he had the pattern, and I took it to Mr. Campbell. Mr. Campbell gave me a pair of pantaloons, with the pattern, back again, and told me to cut them after that pair, and to get the trimmings at Peter's. Before I had them done he come over to my house again, and wanted me to go with him to Mr. John Moore's and see if he could get some good white flannel there for drawers. I went with him to Mr. Moore's and there we bought the flannel; I selected it and Mr. Campbell paid for it; and Mr. Campbell and I went home to his house to get a pair of drawers to cut after, and make up the flannel we had first bought. When I got that work finished I took it home. He then got out of the bed: he was in the bed when I came in; opened a small trunk standing on a chair by the head of his bed. This was in the upper back room before he moved down stairs. He then gave me another twenty dollar bill out of there to get him change for. I took that to Mr. Demarest, and he couldn't change it; so I

had to go to David Terhune to get it changed. He was very busy, and I was delayed some time. Then when I came into Mr. Campbell's house, he says, (Patrick, the working man, was standing there,) I was just about sending Patrick after you; I was afraid you was going to run away with my money, with a smile on his countenance. Said I, Mr. Campbell, I would want more than that to run away with; and says he, Yes, I guess so. I delivered him the money I got for change. He paid me my bill at that time; counted out the money to me out of the money I gave him. It wasn't more than about two dollars or a little over that I was to receive from him. He gave me great charges, each time, about getting silver for the bill; didn't want me to fetch him any rags, he said. I couldn't say to the month the time when this last transaction took place. It was some time after I did the first work for him. I don't think he was out after this last transaction about the flannel and pantaloons. I think when he went with me to buy the flannel was the last time I saw him out. I had no other business with him after that. I did some work for his laboring man after that. I saw Mr. Campbell once or twice after that; once when he was very sick; this was before May, in the course of the winter; it was when they needed a large coal fire. I was there when Robert Gould was there; once in the morning, and once in the course of the evening: the evening I was there he was going to sit up with him. When I was there in the morning with Robert Gould, above referred to, Mr. Campbell was lying in the bed; and Mr. Gould said, How do you do, uncle. I think Mr. Campbell asked him, pretty much right away, whether he had got him that money. And Mr. Gould said, Yes. And he replied, kind of crusty, I suspect you have had it long enough. He says, No, I never got it until last week. And I think he asked him how much he had; what amount. And, if I remember right, he said he had a hundred and fifty dollars. I went home then; just heard those few words and left the room. This Robert Gould is Mr. Campbell's niece's husband. There was nothing occurred in these transactions that I have related to induce me to believe that there was anything different in Mr. Campbell's mind from what it was be-

29

fore. I thought he appeared capable of transacting business. He couldn't go round like a young person; he was feeble. I thought he had as good understanding as ever I knowed him about settling and the like of that. Somewheres about that time that I was there with Robert Gould, just after, I think, I was applied to to go there and take care of him. Robert Campbell, Jun'r, it was who spoke to me about it. He said they had been talking about getting me to go; and wanted to know if I would go. When he overpaid me the ten cents I have mentioned, he understood it; he said, your bill is small enough, here, take that. When I was there the first time he gave me a few pears in a basket to take home to my family. He was generally reckoned to be pretty close about his money. He was liberal to any one who he took a liking to. My mother lived with him six years.

*Cross-examined.* I don't know that I ever had anything to do with Mr. Campbell before these transactions; never had no work to do for him before, that I remember. I never had any conversations with him for three or four years before I moved down in Robert's house, except how do you do, and so as that, nor, in fact, not much conversation with him for twelve years before that. When I lived on the turnpike road he passed frequently, and then he used to stop and converse with me; that was thirteen years ago. The old man was middling deaf the last year of his life I have mentioned. He could hear me without my putting my mouth close to his ear and speaking very loud. During the course of that winter we didn't have to do any such thing as that, unless something happened in the spring. I am a regular tailor by trade; have followed it for twenty odd years; don't keep a shop. The first work I did for Mr. Campbell he had his bed in the upper back room. The last time, I don't know where his bed was. The whole of the work was not done before his attack of sickness, that winter. George Campbell was not there when I did the last; it was before he came up. I remember George's coming there, and being there; see him backwards and forwards at various times. I couldn't say

whether it was before the holidays or after, when I made the flannel. The flannel was not made until some time after I had it in the house; the pantaloons too; it was quite some time. Mr. Campbell put on his overcoat that I repaired for him, to go with me to look at the flannel; I couldn't say how late it was in the season. I believe Patrick was standing by when he paid me the last time. I gave him no receipt; had no book account at all; always settled when the work came in. Now, I really think there was a receipt; I think he wrote it on the stand by the side of the bed. He sat up on a chair when he wrote it. He got up out of the bed and wrote the receipt; had a large cloak wrapped around him. At this time I think he was down stairs, I wouldn't like to say certain; one time, I am certain he was up stairs. I think he wrote the receipt down stairs, in the back room.

*Re-examined.* When I lived up town I lived a little better than half a mile from Mr. Campbell's. I will be fifty-six in April coming. The receipt I speak of that was wrote on the stand by Mr. Campbell was for the last work I done for Mr. Campbell.

*Archibald H. Campbell*, sworn for the complainant. I live and have always lived in the city of New York. Mr. Robert Campbell, deceased, was my great uncle. I am the brother of the complainant. My age is twenty-four years next 4th of February. I was on terms of familiarity and intimacy with Robert Campbell, deceased. I was acquainted with the property formerly owned by my father, George G. Campbell, in New York. The property on Broadway and Mercer street, New York, was sold in 1844. I saw Mr. Robert Campbell the day he received the money; saw him in the carriage. I went with him to the bank, the bank of New York I think. He and my father got out of the carriage, and went in the bank, and I sat in the carriage. He was talking to me coming up. He told me, on the way to Hackensack, that he had received the money for the sale of the Broadway and Mercer street property; and he expected father up in a few days, and then he was going

to have a settlement with him. The next day or the day after, he said he wanted to go to Paterson; that he must go there and make some arrangement if father came up. We went to Paterson, in his carriage; he took his trunk with him. We went to the hotel there; and he went out, with his trunk; and on his return he said he had arranged it. On the day before my father came he proposed to me to go to Paterson again; and we went there with his light carriage. · He said that father would be up the next day, and he would have to go to Paterson to-day. We went to Paterson again. I staid in the hotel, and he went out into the town. After we came up from the bank we went to Paterson the next day, and again two or three days after. I think my father was to come up the first of the next week. I think Mr. Robert Campbell said that the Broadway and Mercer st. property brought some $22,000 or $23,000. Coming up, he said that there would be some $7,000 coming to my father, and that the money would be better to my father now than the property. I staid with Mr. Robert Campbell from the time we came up together until my father came up, and some time afterwards. I was not present at any of the conversations between my father and Mr. Robert Campbell after he came up. I never heard Mr. Robert Campbell say anything about the proceeds of the Broadway and Mercer street property except what I have mentioned. I was at Mr. Campbell's house some two or three days in December, 1845; and when I went down my father came up. He was complaining when I went up there. I think, from what I saw at that time, that he understood himself. There was nothing in his conduct or conversation that struck me as strange. I thought he could transact business at that time as well as he could for some years back. He was very keen; you couldn't get ahead of him : he always would get the best.

*Cross-examined.* He was down at New York with his own carriage at the time I mention. John Kennedy drove him, an Irishman that lived with him. He came back the same day the money was paid to him. I don't remember the day of the week : I think it was the first part of the week. He usually took a

driver with him; never drove himself, as long as I knew him. I don't know, come to think, but that I can remember his driving himself, a long while back. Probably I used to come up and see him twice or three times a year. I staid, I suppose, nearly two weeks, the time I came up with him in his carriage. I staid up after my father went down. I was up again more than once, I think, before his last sickness. I think I never had any business dealings with him myself: I may have got some things for him some time, nothing of any consequence. I never sold my dog to him. I let him have a dog of which I thought a great deal. He wanted to buy him, but I wouldn't sell him. I was up in December, 1845, about Christmas, and found him sick; and then I went home, and father went up. I don't think I was up again before he died. My father would stay a few days and then come home and go back again. He would come home and get some clothes; and sometimes we would send him some. My father did not come home till after his death. He was there off and on until his death. Before his death he was there three or four weeks at a time. I don't think I was at Mr. Campbell's after Christmas until his funeral. I was there at the time when the lock of the drawer of his safe was broken open. This was before his sickness, some time before, I think: it was, I think, in the spring, late in the spring or early in the summer, the year before his death. We were sitting in his back room talking together; near his window he had a pair of large ducks. I was speaking of them, how big they were, and he asked me if I had ever seen any of the eggs they laid. I told him I had. And then he asked me how my fowls come on. I had fowls at that time, and he said he would give me some of the eggs to put under my hen; and when they were hatched, says he, you must give me half of them, I expect half of them: says he, come, and I will show them to you, come in my office. We went into the office, and he went to a place where he kept his eggs. He had, I should think between sixty and seventy eggs there. There was a very large one lay on the top of his safe then. Says he, Arch, I have lost the key of my safe. He went into the place where he kept his eggs, and peeped over, and, says he, when your ducks are hatched I want half of them.

Looking into the place where he kept his eggs, I saw the key of his safe, and said I, there's the key of your safe. So it is, says he. Then he put the key in the lock and tried to open it, and it worked rather hard. Then he asked me to try. I tried, and I couldn't open it with my hand; and then I got a little stick that laid near by, and put it in the key, and took both hands, and then I opened it very easy. Then he felt in his pockets, and couldn't find the key of the drawer. He said, I must have the drawer open, and then he went out to the kitchen and got a piece of iron, I think, and went to the drawer and undertook to open it, and couldn't succeed. Then he wanted me to try. I took hold of it and opened the drawer; and he seemed to be pleased. Have you got it open, says he, and then he took out a purse, or something that jingled, and in it were some few gold pieces. He put a piece which dropped down on the floor in his pocket, and the purse, or whatever he had the money in, into his pocket, and then shut the drawer and safe, locked the safe and took the key. I never locked or unlocked the safe before or since that time. *Question :* What was the operation of unlocking that safe ? I put the key in first, and then pushed it. Come to think, the old gentleman put the key in first himself, and tried to unlock it and couldn't; and then I put the stick in the key and unlocked it myself at his request. I don't know as there was any other operation necessary than to turn the stick after I put it in, to unlock the safe. In opening the drawer the lock was not broken off, not to my knowledge. The drawer was opened by pressing it down, and when it was opened the bolt of the lock was up. After this I staid up two or three days. I rather think that time when I went down I went down to get a box of pills. I don't think I was taken down by his man that time to Acquackanonk or Boiling Spring to take the cars. I have been taken down that way. I didn't see anything in the drawer but the purse. I didn't see what was in the purse except the piece which dropped out. I should judge there were three or four pieces by the rattling. I didn't hear him say that they were gold pieces; don't know that they were. I never saw at that time or at any other time a bond given by my grand-

mother Mrs. Hannah Jenkins to Robert Campbell. Never heard him say he had such a bond. I never told my aunt Mrs. Louisa Gould, or Rosetta Gould, or any one else, that I had seen such a bond. I couldn't have done so, because I did never see such a bond. I never asked them, or either of them, what my grandmother owed my uncle for, nor what such a bond could have been given for. I feel confident this breaking open of his safe was in 1845, and not in the year of his death. I remember when my father lived in Daniel M. Winans's house in 19th st. I think we lived there five years; pretty sure it was five years. I rather think my father was not engaged at that time in any business; can't say for certain about that. He was in no extensive business; he might have been engaged in collecting, or the like of that. He went to New Orleans while we lived there in that house, but he did business in New Orleans before we moved there, it was while we lived in the Mercer street house. Patrick took me down to the Boiling Spring in 1845, but not in March 1846, not as I recollect. I think I did not see my uncle Robert after December 1845. The time I refer to in my examination in chief when I speak of his mind was in December, 1845, when I was up there. His mind was good, I should judge. At that time I slept there at my uncle's house, and took my meals there, except occasionally, I went to my aunt's and took tea or dinner there. I was with him the greater part of the day during the time I was there then.

*Re-examined in chief.* I did not see this safe after the death of my uncle. My father was collector of assessments about two or three years back, or longer. He is such collector now; and I think he was in 1842 and 1843. He collected the rent of the Broadway and Mercer street property at the time my uncle held it.

*James Jackson,* sworn for the complainant. I live at Jersey City; I was acquainted with Robert Campbell, of Hackensack, in his life time. I was at school at Hackensack when a boy, and heard and saw a great deal about him there, and always have

been acquainted with him since.  I saw him in the cold weather of the fall of 1845, or the spring of 1846 ; I think it was 1845 or 1846, to the best I can now recollect.  It was cold weather when I saw him.  I mean the very winter month, November, December, January or February, or somewhere along there.  I saw him at his house, in the back room down stairs ; there was a bed in the room at the time.  He said he was quite unwell.  I think he was lying down when I went in, and got up after I got there.  I called on him to see about some Paterson and Hackensack Turnpike stock he held, and I either wanted to buy it from him or get his proxy.  I couldn't make any purchase from him of the stock ; and he did'nt like to give me his proxy, because, he said, he had given the proxy to other people, who might not like it if he it gave to me.  He said it was the Ryersons he gave it to.  He was not acquainted, he said, with the value of the stock, and wanted me to make him an offer and he would inquire, and I might call again, or he would write me ; something like that.  I didn't make him an offer.  I had some other conversation besides the stock.  He spoke about his bog and fly meadow at Pompton Plains ; wanted to know about the people he had sold it to ; whether they were likely to do well with it, and whether they were able to pay him for it ; said something about John M. Gould in connection with it ; said that he had the papers, and ought to have some money for him by this time.  The names of the purchasers were mentioned by him or me, I don't remember which.  I knew their names, and told him they were good men, and the money would be paid when due.  I think he asked me where I lived, and I told him at Pompton.  He would fly off from one thing to another.  He would talk about one thing and then talk about something else.  I tried to keep his mind to the stock as much as possible, so as to get through and be off.  As far as the business I wanted to do with him I thought he was pretty keen, and anxious about money.  He was willing to sell the stock if he could get a good round price for it ; but wanted time to inquire about it.  From what I saw at that time I supposed he couldn't be deceived.  He seemed to talk well enough, and understand himself perfectly well about

the business I wanted to do with him. He sometimes left that and talked about other things, which I suppose is natural with all men, and I would try and bring him back to the stock business as soon as I could ; I was in a hurry, and didn't want to stop and talk about other things. *Question :* Whether or not was his conversation and conduct consistent and sensible ? He would break off abruptly and commence something else. I think there was nothing about his conversation but what was consistent and sensible. When I was at school at Hackensack I visited Mr. Campbell's house and family ; used to go there to take tea frequently. There was a Mr. Campbell there at the time I was there about the Turnpike stock. This gentleman has called upon me at Jersey City to ascertain whether I remembered about that conversation. He was in the room the most part of the time when we were conversing. I now understand that the name of this gentleman is George G. Campbell. I know Adolphus W. Campbell. The gentleman that was there was not Adolphus ; I don't think it was him. I understood from the gentleman who called upon me at Jersey City that he lived at New York.

*Cross-examined.* I think it is 30 years since I was at school at Hackensack. I couldn't say positively, but I think it was the spring election of 1846 that I wanted the stock for. The doubt in my mind is whether it wasn't later, but it couldn't have been earlier than 1845 or 1846 ; but as he died, as I am told, in 1846, it couldn't have been later than 1846. He didn't ask me any price for the stock ; he seemed to intimate that if he could get a round price for it he would sell. I got the impression that if I made him any offer he woulnn't accept it at that time. I think his intellect was impaired, and changed from what it was when I first knew him. I don't think he was as strong a man ; certainly not ; I must say, as I said before, that he seemed to understand what he was about. I don't think he would have closed with me for any offer, unless it was some sum which was far beyond what it was worth. No price was named by either of us. *Question :* Do you think he had mind enough left, if you had

made him a liberal offer for the stock, to have known it was his advantage to take it? *Answer :* If he had known the value of the stock, I suppose he would have taken it; if I would make him an offer, and give him time to inquire and ascertain its value, he would take it, I suppose, if it had been a liberal offer and more than any one else would give. I thought he understood himself perfectly well. *Question :* Was not his conversation, during the whole of that interview, fitful and incoherent? *Answer :* Yes, it was as I say ; when I would talk with him he would understand himself, but he would break off ; and when Mr. Campbell came in he would turn round and speak to him and ask him some questions ; Mr. Campbell was going in and out very often. When I said deceived, in my examination in chief, I meant to say that I didn't think he could be deceived in a matter of business. I didn't want to impose upon him or deceive him. My business was a plain business transaction, to buy his stock or to get his proxy ; didn't mean to say that others could not deseive him ; for smarter men than either he or I have been deceived. I made no representations about the value of the stock, or attempts to persuade him to sell it. I can't fix on the time as to the month ; think I was there in a wagon, I think ; won't be positive ; it was cold weather ; won't be positive, but think it was after the holidays. He complained about their not bringing him wood. He had a Franklin stove, I think, in the room.

*Re-examined in chief.* I don't think Mr. Campbell had paid any attention to that stock, I don't suppose he had. It has never paid any dividend, to the best of my knowledge. I think the first intimation I had that he had given his proxies, was what he said to me that day. I never saw the Ryersons use his proxy. I bought that stock from Mr. Zabriskie, Mr. Campbell's Administrator, one or two years after the interview with Mr. Campbell. Mr. Zabriskie, I think, took time to consider before he sold to me.

*Again cross-examined.* I think I attended the next election.

That was not a contested election. There was no fixed price to that stock at that time. I had no fixed rates at which I purchased; I bought at one dollar, and five dollars a share; at different prices.

A paper purporting to be a letter, dated Nov. 7, 1845, signed by Robert Campbell, addressed to Walter F. Williams, being offered in evidence on the part of the complainant, and being admitted by the defendant to be the paper referred to by Walter F. Williams in his examination, it is marked *Exhibit W. F. W., No.* 1, for complainant.

A paper purporting to be a lease given by Robert Campbell, Trustee, &c., and admitted by the defendant to be the lease referred to by the said W. F. Williams in his examination, is offered in evidence on the part of the complainant, and marked *Exhibit W. F. W., No.* 2, for complainant.

*Walter F. Williams, Jun'r,* sworn for complainant. I live at Bull's Ferry, Bergen County. Am the son of Walter F. Williams. I did know Mr. Robert Campbell, deceased; saw him once. Saw him at his own residence; went there with my father, who went to see Mr. Campbell. We went there to pay a quarter's rent for a place we had of him at Bull's Ferry. The old gentleman, when we first went in, was sitting in a room with a cloak or coat around him; and the first word he said was, You have come down upon us without sending us any word. My father said he had come to pay him some money. Well, he said, and laughed, that's all very good; asked us to take a chair and sit down. His nephew, George Campbell, was there. Father took the money out of his pocket and laid it down on a small stand or table that I think was there; the money was $17,50. He asked George to make out a receipt; told him to make out a receipt and not to say what quarter it was for, but just to say it was $17,50. And George asked him if he would sign it himself or not; and he said he would sign it himself. The money was rolled up, and put in a small box with a half round top, I think. His nephew George took the key out of his vest pocket.

George asked him for the key, and I think it wasn't in the place where he said it was, and George felt in his pocket. I think he said it was under his pillow, for George went to the head of his bed. After the money was put in the box George locked it, and returned the key to Mr. Campbell. Mr. Campbell understood how much he was to receive for the quarter's rent, for he told his nephew George to make out the receipt for $17,50. There was some few words passed about hiring it for another year. The question was asked if we could have it for another year. He said he didn't know of any thing to hinder. There was some-thing said about the fencing between the back part of the prop-erty and Mr. McDonald's. He said he had paid some money for the fixing of it; he didn't know whether it had been done. There was nothing about his conversation about the business that struck me as strange, except at the entrance first into the room, when he said, You have come right down upon us, &c. I reckoned he understood the business we came there about very well. From what I saw there, we were not there but a short time, I din't see any thing that induced me to think he wasn't capable of doing business. I think this was in February; the receipt will show; it was in the year Mr. Campbell died. He died in the following June. The receipt was the last he gave father. *Exhibit C.*, on the part of the complainant, being shown witness, he says, that's the receipt. It is drawn up in the way he ordered, and that's his handwriting, the signature.

*Cross-examined.* I am something like twenty-one years and six months old. I lived with my father at that time at Bull's Ferry. It is called about eleven miles from our house to Mr. Campbell's. I didn't go with my father that day for any par-ticular purpose. I didn't go to be a witness to my father's pay-ing the money. The old gentleman was at the breakfast table when we went in, that is, there was a small table before him with a cup and saucer on it, and he seemed to have been eating. I can't say whether it was breakfast or dinner.

*Edward Dawson*, re-called on the part of the defendant. A

paper purporting to be a receipt, dated Nov. 15, 1845, being shown to him, he says : I think the name to this paper is in my handwriting. And being shown two other papers purporting to be receipts, one dated Aug. 11, 1845, and the other Sept. 5, 1845, he says : The signature to the last one does not look like my handwriting, but I won't say it is not. The signatures to all three of these receipts may all be my handwriting. I am no great scholar ; can just make out to write my name. I can't say that the body of these receipts is in Mr. Campbell's handwriting. I don't remember of giving but the one receipt I mentioned in my former examination.

*Cross-examined.* Mr. Campbell wrote the one that I remember giving. (The three receipts above mentioned are marked *Exhibits* 1, 2 *and* 3, for the defendant.)

*John Kennedy,* sworn for the complainant. I reside in the township of Lodi, Bergen County. I knew Robert Campbell, deceased, in his life time. I lived with him for, I should suppose, close on three years, the three years close preceding his death. I attended him in his sickness, the one previous to the one that took him away. I always found him pretty straight and correct in his contracts with me. So far as I was connected with him he was able to attend to business. He always took receipts from me when he paid me money. He paid me once a month. He was very punctual about making the payments, and would call me in often when I forgot it myself. He was very particular about taking the receipts always. From my dealings with him I wouldn't think he was a man who would be likely to pay money over twice, or to give a receipt for money without receiving it. He was, so far as I was connected with him, very correct. As long as I lived with him I always found him pretty sharp about his own business. I have not the slightest doubt but that he was competent to attend to his own affairs during all the time that I lived with him : even during his sickness I saw that he was as careful as could be expected at that time. I was his personal attendant, occasionally. I had out of door work. He

had part of the time some one else to attend him. When I attended him he had another man around the house ; he slept in the house the same as I did.

*Cross-examined.* I cannot tell what time I went to live with Mr. Campbell; I really cannot think of the year ; I think it was in the month of June, but what year I cannot tell. I left there, I think it was about the month of June, the June previous to the sickness that took him away; I cannot tell the year. I do not know in what year Mr. Campbell died. I left him the summer before he died, in June I think. I don't know when I left him as to the time he died ; it might have been a year previous, but I don't know, as I don't know when he did die. I didn't stay with him until he died ; I left him before he died; can't say whether it was some months or not. I was not at Mr. Campbell's during his last sickness at all. After Mr. Campbell recovered from that spell of sickness he had, he was able to go out. I can't describe the time when he had this spell of sickness, but it was the time Dr. Stevenson attended him. He recovered from this sickness I speak of before I left. He went out after this sickness, up to the time I left ; I can't say whether it was every day he went out ; sometimes he would'nt feel very well and inclined to stay in the house. He went out about as much as he did previous to the time of being sick. The reason I left Mr. Campbell was, that I had spent a good deal of my time at night during his sickness, and I considered that according to his words he would recompense me when he got well, which he did not, and thought I would seek some other employment. I never had any other difficulty with Mr. Campbell than that. On parting at that time there was no immediate reason of my leaving him than what I have stated. I did his errands in the village chiefly ; buying things at the groceries and the like of that. I always seen that he was correct in looking for a proper return, in making these errands, and in giving me directions for them. I never knew him to forget a thing in which I was connected, in any shape or form. I think his mind during the latter part of the time I worked for him was the same as it

was when I first went to work for him ; I didn't see any differ-
ence in any transactions I had with him. I don't know that I
ever see Mr. Campbell before going to live with him ; although
I was a considerable time in the village ; I do not recollect the
last receipt he took from me ; ⁓ think the last receipt was for my
wages though ; ⁓ don't know that it was any different from the
other receipts he took from me.

*Garret Smith,* sworn for complainant. I live at Brooklyn,
New York ; am forty years old. I was acquainted with the late
Robert Campbell, of Hackensack, in this State. I suppose I
was acquainted with him for 20 years, that is, I knew the man.
I had business dealings with him. I considered him always a
sharp, shrewd business man. It was some time in the winter
of 1846 that I last saw him ; whether January or February I
can't say ; there was snow on the ground. I am persuaded it
was February, upon reflecting. I saw him then in his bed at his
house. He spoke to me then about some money which was due
to my mother, which he was trustee of. I don't know as I formed
any opinion at all at that time on the subject of his competency.
I don't think that any one could have overreached him at the
time. All the dealings I ever had with him he was very strict.
I don't think I ever received a cent from him without giving him
a receipt for it, whether I received for myself or for other par-
ties.

*Cross-examined.* At the interview I speak of in February,
1846, I was there, I think, about three hours. There was a man
there whom he called " Adolph." (The witness here identifies
Adolphus W. Campbell, here present, as the person he saw there
at the time he mentions.) I think the old gentleman recognized
me at first when I went in ; I think I did not have to tell him
who I was. He got out of bed while I was there. He conversed
upon several subjects at the time. I called to see him not on
any business, but called as I was at Hackensack. I always made
it a point to call on him when I went to Hackensack. He in-
troduced the subject of business to me first. He asked me if I

had called for the interest due my mother. I told him I had not, I called there for the purpose of seeing him. He observed that he had the money ready, and was ready to pay it. I think nothing else passed on that subject. He told me, I think, that he had the money in a little trunk under his bed, and the key was in his pantaloons pocket, and he wanted me to get it, which I didn't want to do. He wished me to get the key. His pantaloons lay on a chair near his bed.   don't Inow whether this was before he got up or after. He was up, and went to bed again; he didn't set up. The interest to my mother was then past due. That interest was in his hands as Executor of Garret P. Smith; it was interest to be paid to my mother during her life. I was in the habit of collecting the interest; it was generally paid into my hands. I think a gentleman from Hackensack brought a check for that interest, dated some time, I think, in February of that year, a check of some Sythoff, I think the name was, and for some eighty odd dollars. I don't remember when it was paid; runs in my head it was after Mr. Campbell's death. (Two papers, one dated May 9, 1843, and the other August 29, 1844, purporting to be receipts, being shown to the witness, he says :) These receipts were given by me. The addition at the bottom of these receipts on my part to pay to my mother, was made at his special request. (Another paper, purporting to be a receipt, dated April 27, 1846, being shown to the witness, he says :) That receipt was also given by me, for the payment on the interest made in 1846, above referred to, of eighty odd dollars. (The three receipts were offered in evidence, and marked *Exhibits No.* 4, 5 *and* 6, on the part of the defendant.)

*Peter I. Ackerman,* sworn for defendant. I live in the township of Hackensack. I knew Robert Campbell in his lifetime. He was the regular counsel of myself, father and mother, and we stuck to him as long as he was fit to do business. I, and my father, in his lifetime, and my mother after his death, were in the habit of investing our money upon bond and mortgage. Mr. Campbell was intrusted, generally so, in fact, at one time was always so, with putting out this money, and advising about in-

vestments. I used to be in the habit of seeing him and advising with him about business, from the year 1825, and some time before, for thirty years at least. I was in the habit of seeing him towards the last of his life. The first I did discover any failure in his mind was when he bought the Paterson property. The day of the sale he was running up the property, and I told him there was a back rent on it, and I couldn't make him believe it. After he bought the property he found I was right; and after that I thought it was time to stop doing business with him; and since then we haven't done any business with him at all. This was, as I perceive, by the mortgage given directly afterwards, in 1840. His mind was very much changed then as to his business capacity, as I thought. I saw him afterwards on other business, received interest on the bond and mortgage given at that time. My mother was one of the parties in interest in that foreclosure sale, and Mr. Campbell bought in the property, and gave her a bond and mortgage on that property. His mind was getting worse, as I noticed in those interviews I had with him afterwards, as was the case with old people. Sometime afterwards I was at his office, and wanted to get something from his docket. He looked at it for some time and couldn't find it. I knew it was there, but finding he was getting kind of cross I turned the conversation to something else, and then, after a few minutes, asked him if I might look for it myself. He said, yes; and, as I knew the year, I looked for it and soon found it. That was a sale of some property on a foreclosure suit in which he was the lawyer. *Question :* Was it a matter which he would have recollected in his former days without looking at his docket? (Objected to by complainant's counsel.) No doubt of it. He paid off that bond and mortgage to me for my mother; on the 29th of May, 1844. His mind was not at that time as it used to be. He came to my house to pay. I was on the back part of the farm. He wasn't going to leave until he saw me, and staid several hours. When he came to pay me he had with him his nephew, as he called him, a son of George's, and he told him to go out and take care of the horse. He said he didn't wan't these young chaps about when he was

30

paying out money. He told me to go and get that bond and mortgage. That he was going to pay it off. I went and got them. He laid down three bills; one was a $1000 bill, and the other two were $500 each. Says he, there's your money. I said, are you not mistaken, Mr. Campbell. No, says he, can't I do my own business. It was after some little time, and reasoning with him, and getting him to make a calculation, before I could get him to see his mistake. We looked over them, and he made a calculation, and I too. He made the calculation out right. The mistake was $160 odd. By looking at the note I see it was 168.68. This was against himself. He said he had calculated it before he left home. I know that this was the amount because I said that he could indorse it on a little note my mother had against him. He appeared to have forgotten about there being a little note until I showed it to him; it was a note for $468.75. (It is exhibited on the part of the defendant, and marked O, *No*. 4. *Question :* Would he have paid the $2,000 for the bond and mortgage if there had been no one there able or willing to correct him. (Objected to.) *Answer :* I could have taken it just as well as not. At first he said he was right. After talking to him a while, after he saw the amount of the bond and mortgage, he went to figuring, and made out the calculation correct. I saw him after this, but not during his illness. He didn't hesitate a moment, after he found out his mistake, in crediting the balance on the note. At the time I saw him after this his mind was failing. I didn't think he was able to transact any business, at the time that I saw him after this, that required a recollection and a clear head. I wouldn't have trusted him since 1840 to do any business for me, or since that sale : that convinced me that I wouldn't risk him to do my business. (The bond and mortgage spoken of by this witness being shown to him, he says : The indorsements requesting the clerk to cancel, upon both papers, were written by him at the time he paid them off. The one on the mortgage was signed in my presence and was attested by me; the one on the bond was not executed, because I told him that the one on the mortgage was sufficient to cancel that, and that the bond was can-

celed by tearing his name off. (The bond and mortgage were marked *Exhibits O, Nos.* 5 and 6 for the defendant.) He insisted upon my mother's making her mark upon the receipt on the mortgage, but the receipt on the note he wanted me to make. My mother was in the room, and I thought it singular that he should want her to make her mark on the mortgage and not on the note.

*Cross-examined.* My mother's mortgage was the second mortgage on the property at Paterson. Mr. Campbell had no mortgage on that property. The mortgage held by my mother was given by Mr. Sythoff. The foreclosure suit was, if I mistake not, started by Yates & McIntyre : they had the third mortgage. Mr. Campbell drew the bond and mortgage that he gave to my mother. I didn't see him write it, but it is in his handwriting. He had the amount right in that mortgage. He had, I think, a calculation with him of the amount. I didn't do any business with him after he paid me the amount due on that mortgage. I think I have had conversation with him after that. I think once I was in there to see him after that. I think it was in the back room of his house. It appears to me that I went in merely to see how he was; had no business with him, I think. I couldn't say when this was, whether in the fall after he paid me that money, or the next spring· I think it was after he paid me the money. I couldn't say word for word what we talked about. I asked him how he did, and he told me how he was getting along. He found fault about his servants as he always did. He was always cross, and pretty pertinacious about his own opinions; but his opinions were generally pretty good. When I told him about the ground rent on the property at Paterson, he said he knew better. The mortgage upon that property was not given to my mother, I think; I may be mistaken, but I think not: it was given to my father, if I mistake not. My father, John I. Ackerman, died in 1827, I think. The date of the transaction I wanted to find on his docket was five or six years before I called on him; I think it was; couldn't tell now; I feel satisfied it was some five or six years. I couldn't tell the bank the bills

were upon which he paid me; it was one of the city banks in New York. It took him some little time to make his calculation. He came out right the first effort. I made it out a good deal quicker than he did, but still he was right. I do not remember that he wrote the receipt upon the bond supposing it to be the mortgage. I had no objection to signing both; none at all, if had insisted upon it; but, after signing one, I told him there was no use in signing the other, and he agreed to it. I know very little about whether he attended to his own business from 1840 to the time of his death. At the time I called to see him I have mentioned, he was there, and seemed to have things about him as though he had the control of matters. There was nothing that occurred at that interview in the back room I have mentioned that led me to believe he was changed as to his capacity any more than is usual with old people. From May, 1844, to the time of his death I had no opportunity of judging of his capacity. I saw him out, but did not talk with him. From what I saw of him I made up my mind that it was old age, and that he wasn't fit to do any other business. I think old age brought it on. I don't think he was insane or out of his mind, or anything more than wasting away with old age, or his mind broken down with old age. *Question :* At the last interview spoken of with him, was there anything said, or that occurred, that struck you as out of the way, or that surprised you? *Answer :* I don't know that there was. My mind was already made up and I didn't notice anything. I judged from his deportment, his manner, his conduct and what he said. He was an old man, he was wasting away, and there was nothing of him; that's the way I viewed it. He told me how he was. I don't say there was nothing of his mind left, but there was nothing left to do business with. He was a small man, and was wasting away, bodily as well as mind. I was born June 2, 1801.

*Re-examined.* (A paper purporting to be a receipt for back ground rent being shown to witness, he says:) The indorsement on that paper is Mr. Campbell's handwriting. (The said paper was offered in evidence and marked as an Exhibit on the part of

the defendant; and also a sheriff's deed, dated January 13, 1840, duly acknowledged and recorded; the first of these Exhibits being objected to for any other purpose than to show that the indorsement is in Mr. Campbell's handwriting, and also for irrelevancy.) It was so long ago that I cannot form any idea whether $3,000 was a full price or not for that Paterson property. I have forgotten what he did pay. I was thinking he was paying the full value of the property and then had the back rent on the top of it.

*Again Cross-examined.* I then supposed the back rents amounted to $1,100, or $1,000. I represented to Mr. Campbell what I supposed the amount was, that it was $900, $1,000 or $1,100.

*Mrs. Louisa M. Gould,* sworn for defendant. I live at Hackensack; am a daughter of George Campbell, and a sister of George G. Campbell, and a niece of the late Robert Campbell. I was brought up in my uncle's house, and lived there until I married. I lived in Hackensack for the last eight or nine years of my uncle's life, and was in the habit of seeing him frequently, until within a short time before his death, until the month of July when he died. I know Archibald Campbell, the son of George G. Campbell. He was in the habit of calling at our house when he came to Hackensack; staid there when he came to Hackensack; made it his home there. He came up from my uncle's and said to me: Aunt Louisa, I have seen grandmother's bond in grandfather's office; that's the words as near as I can recollect. He said, I think, to the amount of seven hundred odd dollars; I won't be certain whether it was hundreds or thousands: that's all he said about the bond; yes, he did say something else; he said he could have taken it, or he wished he had taken it, or something to that effect; can't recollect exactly. I don't recollect that he said what part of the office he said he saw it. His grandmother was Mrs. Hannah Jenkins. When he spoke of his grandfather, he meant my uncle Robert Campbell; that was his customary way of speaking of him; the

children all called him that. I think this was in March before my uncle's death; I am certain it was the spring before he died; I can't say what month exactly. He didn't say he had just come from my uncle's office, but I think he had. He didn't mention when he had seen the bond. I saw my uncle Robert frequently during the winter before his death. He used to send up frequently for me to come down and see him. I don't think his mind was right; don't think he was himself; he was a child in some things, and sensible in other things. He made mistakes. My brother George was up and down that winter. I don't remember when he went away. I think Archibald was up and down during that winter: he was in the habit of going backwards and forwards all the time. My uncle's recollection that winter was not good. During May and April before my uncle's death I didn't see him out of doors. He went from one room to another, and up-stairs. I can't say that I had noticed any alteration in his mind previous to his last sickness. He had two attacks. The first was early in the spring or late in the winter. It was the middle of winter when he was taken sick. His last attack was in July. *Question :* Was his mind out of order in the sickness in the winter? *Answer :* I think it was.

*Cross-examined.* I have no interest in the event of this suit; am in nowise interested. I am not one of the persons in whose favor George Campbell, my father, has made a conveyance; he has made nothing to me. My brother George's family and mine are on good terms in some things. I am on good terms: some members are not on good terms. My husband and my brother George are not on good terms. My children and my brother George and his children are on good terms. I don't visit my brother George's family, on account of unpleasantness be-tween my husband and my brother George, and between myself and George's wife. My daughter Rosetta visits there, and Archibald has been at my house. Robert G. Campbell has not been at my house since the death of my uncle. My uncle was sensible in giving advice to his friends in some things: sensible in giving advice to us. I don't think he was sensible in coun

ing out money; did not know what money was.  I don't think during the last sickness he was sensible enough to have disposed of his property, nor during the latter part of his life; I mean during the winter before he died.  If he had, I think he would have arranged things very differently from what they have been. He had told me what he intended doing with his property ; not during the latter part of his life ; he did perhaps one or two years before he died, but not during his last sickness.  He talked with me during the winter, early in the fall I think, about giving me his silver.  He talked sensibly about that subject then.  I was down there one afternoon, and he was talking about his silver, and wanted to know about it, whether it ought not to have been kept in flannel or green baize.  I told him yes, as it used to be.  He told me it was up stairs in a trunk, and then he said he meant to give me that when he died, and didn't want me to say anything to the other connections about it.  He said he wanted to keep it as a remembrance for my aunt and grandmother, and wanted me to keep it in the same shape.  Didn't say anything about not changing the initials.  I can't remember any things that he said childish during his last sickness, not particularly, word for word.  He called people by their wrong names ; called the girl in the kitchen by a wrong name, different from what she had.  I don't think he was capable at all times of taking care of his business, not during the winter before his death.  He wasn't capable of counting money, nor of receiving it ; wasn't capable of taking care of things around his house, his keys, and such things as that.  I can't exactly say that I observed anything else that he couldn't take care of, except that he couldn't find his clothes, and things like that.  He was like a child in everything; couldn't find his keys.  He was sensible in giving me advice about my children, about educating them ; said that was the principal thing I had to do for them.  In other things he was like a child.  He could give advice for a few moments like a sensible man, and then he would fly off and talk like a child.  I mean to say that he didn't know what money was. He didn't know the difference between a five dollar gold piece and a cent.  I saw that once, when he paid money to Mr. Za-

briskie the shoemaker, and once when Mr. Romaine came round for minister's salary, when he couldn't count out the money, and I had to count it out for him. My uncle didn't know money when he saw it. He didnt know silver when he saw it. I never saw him with bank bills, it was always silver that I saw him with. The time when he paid the bill to Mr. Zabriskie was in the winter as he died in the summer. Mr. Campbell could see well; he could see; he wore specs, could see to count out money, could see to read, could see well enough to count out money if he had only known well enough.

*Rosetta B. Gould,* sworn for defendant. I am a daughter of the witness last sworn. I live in Hackensack, with my father and mother. I was present at a conversation between Archibald Campbell and my mother about Mrs. Hannah Jenkins's bond. He came up from uncle Robert's that morning, and said that he had seen his grandmother's bond for $700, and, I can't recollect his words well, but he said he wished he had taken it, or he could have taken it. He said he had come from his uncle Robert's that morning. He didn't say where he had seen it in the office. He staid at our house about an hour after that. Uncle's Irishman came up after him with my uncle's horse and gig. Patrick was the Irishman's name. Archibald said the Irishman was going to take him down to the Boiling Springs to go by the railroad to the city. This was in March before my uncle died. I was in the habit of seeing my uncle Robert frequently the winter before he died, and from that time until he died. His mind and recollection during that time was very childish. He showed his childishness by his conversation, and different things. He did not call his relations by their right names. His nephews Adolphus and George G. Campbell were much about him that winter. He called them by wrong names at times. He called cousin Adolph, Suydam, and uncle George, Archibald. Uncle George had had a brother Archibald that was dead; he died before I can recollect. I am 19 years old. He didn't know his servant's name. He didn't always know me; he would sometimes mistake me for my mother, and sometimes for my sister.

He knew my mother and sister and myself well before his last sickness. We had for some years lived directly opposite to him. I used, some days, to see him three or four times during the course of the day. He would frequently call over to our house, as often as once a week, I think. I frequently heard my uncle George say during that winter that he wasn't capable of doing business.

*Cross-examined.* The way the conversation between Archibald and my mother about the bond was this : Archibald said that uncle Robert had given him his watch to get it repaired, and he could take it and he would forget all about it, and then he mentioned about the bond. There was nothing said about the bond before he said he had seen it. I am sure he said it was just $700. He said nothing about the date of it, or what it had been given for. I am sure that he said something about taking the bond, that he could have taken, or wished he had taken it ; I am confident of that. My mother or I said nothing in reply to what he said about taking the bond. I never heard any thing about there being such a bond before that time. It was after dinner that he came to our house. I didn't know before he came there that he was at my uncle Robert's. I knew he was in Hackensack. He stated that he just left uncle Robert's and come direct up to our house ; it was between 12 and 1 o'clock. We dine at our house at 12 o'clock. I couldn't tell the precise time he came there. The table wasn't cleared away, but we were through dinner. He staid about an hour. These mistakes of my uncle in calling persons by their wrong names was in the latter part of the winter. I was not here in his last sickness. I don't recollect of any one's telling him of his mistakes in calling wrong names. During that winter he talked sensibly very seldom, if ever ; his general conversation was very childish. I don't recollect any thing particularly foolish that he said. I am on good terms, as far as I know, with uncle George's children. I am friendly with Robert G. Campbell when I see him, and with Archibald. Robert G. Campbell has not visited our house since my uncle's death, that I recollect. I go to New York

pretty often. I have called at uncle George's two or three times since uncle Robert's death; I think three times; the last time was last fall. There is a difficulty between my father and Geo. G. Campbell, and between my mother and Mrs. George G. Campbell. I and George G. Campbell are friendly; we speak together when we meet.

*Re-examined in chief.* The house where we lived was out of the road to the railroad from Robert Campbell's; we lived up town then. I don't recollect of seeing uncle Robert's safe after it was broken open. I recollect hearing of it at the time it was found out. That was after March; after Archibald was up to our house; I can't recollect how long; it was not long.

Again *cross-examined.* I heard it first from father. I can't say as near as a month or two months how long it was after Archibald was there that I heard of it; I don't think it was as long as a month.

*Michael M. Wygant*, sworn for defendant. I reside at Hackensack. (He proves the signatures to *Exhibits O*, *Nos.* 1, 2, 3, to be the handwriting of Edward Dawson.) I knew Mr. Campbell, in his life time. I had some business with him when he was just recovering from the sickness which he had before the last sickness; it was the season John Kennedy lived with him. I had some money to collect from him; a bill in favor of David McDonald. I formed my opinion then that he wasn't the man that he had been; he wouldn't have made the questions he did from me. I had a bill against him, and he said he wouldn't pay me, but I must sue him, and that he could get a receipt from the Justice. The bill was not in my name, but in Mr. McDonald's name, and certified by Mr. Garrabrant in the manner which he had directed by a letter in his handwriting, which I saw. I had no other business with him besides this for a short time previous to his death. I collected a bill from him for Richard Hawkes; I think this was before this bill of McDonald's, but it might have been after. At first he was a little huffy about

that, and wanted to be sued in the same way, but finally paid it. I was at that time a constable, and had been so for some years, and Mr. Campbell knew that; and I had done business for Mr. Campbell as Attorney before that.

*Cross-examined.* This bill of McDonald's was for part of the expenses of building a partition fence between the farm of Mrs. Miller and McDonald's farm. Mr. Campbell disputed the bill at first. The ground he would not pay it was not because he wanted Mr. McDonald's signature; I think not. I had no order from Mr. McDonald to receive the money; nothing except the bill and Mr. Garrabrant's certificate. Mr. Campbell afterwards paid the bill without being sued; after George Campbell had advised him to pay the bill. I was by and heard Mr. George Campbell advise him to pay it. He said it was for Mr. Miller's estate. The amount of the bill was about $20. Mr. Campbell took my receipt for the money. I don't think I had any other business with Mr. Campbell, or had any other conversation with him except these two occurrences. I can't say whether Mr. Campbell had the management of his own affairs from that time until his death; I don't know any thing about that. George Campbell seemed to have a good deal to say about that bill.

The defendant here offered to swear Robert Campbell for the purpose of correcting and contradicting, as stated by the defendant, the testimony of Archibald H. Campbell. To this the complainant's solicitor objected.

*Robert Campbell*, sworn for defendant. I saw the iron safe of my uncle Robert after the drawer had been broken open. The first that I saw the safe after it was broken open, I suppose, it was likely, was in the spring, March or April, 1846 ; I am satisfied it was the year 1846. It was not long, I presume, before this that I saw it when it was not broken open; perhaps a week or two. The safe was not broken open; it was a wooden drawer in the safe that was broken open. When I saw it the last time

before it was broken open this drawer was shut and locked, and not broken. I have no recollection whether Archibald Campbell was up at Hackensack between the time I saw the drawer safe and sound and the time when I saw it afterwards, when it was broken open. I can say I think he was, but I have no positive recollection of seeing him. I never saw Patrick take him down in a gig towards the railroad.

· *Samuel H. Berry*, sworn for the defendant. I reside at Hackensack. Have known Robert Campbell 50 years at least. I have been Sheriff one term of three years, and the term of two years, and County Clerk five years, while he was Practicing Attorney at Hackensack. My County Clerk's time expired November, 1840. I had much official and other business with Mr. Campbell during my acquaintance with him; had a great deal of business with him. I thought I saw a difference in his capacity to do business during my term of office as Clerk. His recollection was gone; this was the conclusion I came to; in fact he said so. He came up there to the office in 1839; he had obtained a judgement against a Mr. Cole, in favor of Mrs. Dempsey; this was the last suit he ever brought in our Courts here. He handed me the bill of costs to tax. I took it from him, and saw that it amounted to $15 and some cents. I said : Mr. Campbell, that can't be right. He turned round, Why not, sir. I said, you are entitled to a great many rules that you have taken in the minutes. Mr. Campbell said, No such thing, sir. I said, I can convince you in a minute by turning to the minutes. So I turned to the minutes, and read to him what had been done. And I said to him, this bill is one-third less than it ought to be ; there was no charge for these rules and the *cognovit*. Well, he says, you amend the bill and make it proper. He at that time told me (he owed me a bill for fees) to bring his bill down with that bill of costs; which I did, some week or two after. I told him I had taxed the new bill for him. I think it came to a little over $22. He said he was very much obliged to me, he should have lost that money. I had known him to be accustomed to draw bills of costs in similar cases, and of larger amounts. He

was more particular, rather, than the other members of the bar to have all that he was entitled to in his bills of costs. He was very correct, too, in drawing his bills of costs. I will venture to say, that ten or twelve years before that he would have had that bill as large as I had it. I didn't see him afterwards on business except once before his death. I saw him in the street and conversed with him. His mind appeared broken down. I saw him often after that up to the time he was taken sick, at least once a fortnight I should think. I do not think his mind was in a state to do business that required memory and intelligence. I think a person in whom he had confidence could impose upon him.

*Cross-examined.* I think as early as 1839, the last business transaction I had with him, he was not fit to do business. I don't remember the style of the action in the case I mention, nor what the rules were about; there were some three or four rules besides the rule for judgment, I am not able to say whether there was an assessment in the case. This was the last business I had with him except once he called on me to get a little search. He gave me the names of the parties and the property; his directions were such that I could understand them. As a general rule there was rather more failure in his mind than in old people of his age. I couldn't remember the subject or tenor of any conversation I had with him. It must have been within a year after the bill of costs that he gave me directions about the search. I had no conversations with him during the last year of his life. I think I saw him twice during that year; early in the fall; pleasant weather, however.

The paper writing purporting to be a receipt from Robert Campbell, deceased, dated Hackensack, February 28th, 1846, is as follows: "This is to certify that I have received from George G. Campbell, at sundry times, full satisfaction for the following Bonds, viz.: One Bond for One Thousand Dollars, to Smith's estate, and Two Bonds to myself, for One Thousand Dollars, the other for Fourteen Hundred and Fifty Dollars. All

of said Bonds I have destroyed, the dates of which I do not re-collect ; by my request they were left in my possession.

"ROBERT CAMPBELL, Sen'r."

*A. Whitehead* for the complainant.

*A. O. Zabriskie* and *William Pennington* for the defendant. They cited 7 *Paige*, 137 ; 11 *Wheaton*, 258 ; 1 *Jac. & Walk.* 204, 224 ; 2 *Story's Eq.* sec. 1039 and 40, 1839 and 40a and b, 1196, 1040c, note 1.

THE CHANCELLOR.    The trust, in the deed from George G. Campbell to Robert Campbell, since deceased, was, that, from the proceeds of the property, a debt due from the said George G. to the said Robert Campbell should be first paid, and then, certain specified debts due from the said George G. Campbell to other persons.    The property was sold by the trustee, in his lifetime.    George G. Campbell, afterwards, assigned to Robert G. Campbell, his son, all his interest in the said trust deed ; and this bill is exhibited by the said Robert G. Campbell, against the administrator of the estate of the said Robert Campbell, deceased.    George G. Campbell is not made a party in the suit ; but has been examined as a witness for the complainant, under objection to his competency.    The question in the cause to which the great body of the testimony on both sides has been directed is, whether there is any subsisting claim against the trustee, under the provisions of the trust.    The complainant examined George G. Campbell to prove, that the said debt due from him to Robert Campbell was paid by him the said George G., and with moneys not derived from the trust property, and thus to sustain his claim to an account.    On the other side, a great amount and variety of testimony has been taken, to disprove the said alleged payment by the said George G. Campbell, and to show that there was nothing due from the trustee, under the provisions of the trust.    My conclusion from the whole testimony is, (it is not necessary to recapitulate it,) that the evidence of the said alleged payment by the said George G. Camp-

bell has been overcome by the facts and circumstances shown by the testimony on the part of the defendant; and that there is not sufficient evidence that there is anything due from the trustee, or the defendant, who represents him, under the provisions of the trust, to call for an account.

But, is George G. Campbell a competent witness to prove the payment alleged to have been made by him? The conveyance in trust was, to pay a debt due from him to the trustee, and then to pay certain other debts due from him to other persons. Can he, by assigning to a third person his interest in the trust, become a competent witness to prove that he paid the debt due from him to the trustee, with funds of his own, not derived from the trust property? I think not. But, if he should be held to be a competent witness, on the ground that, having assigned all his interest in the trust, it is indifferent to him, in point of interest, whether his assignee recover more or less, or anything at all, from the trustee, his testimony would be entitled to little consideration, unless the good faith of the assignment should be satisfactorily shown. The assignment may have been made for the very purpose of putting George G. Campbell in a position to make out the case, in the name of the complainant, by his own oath; and the circumstances of the case and testimony in the cause strongly impress the conviction that it was made for that purpose. Again, as to the *bona fides* of the assignment to the complainant; what consideration would a *bona fide* assignee pay, in reliance on George G. Campbell's affirmation that he had paid the said debt due from him to the trustee, and in expectation of making George G. Campbell's testimony available, in a suit between the assignee and the trustee, to prove such payment? There is no satisfactory evidence of the *bona fides* of the assignment to the complainant. On the contrary, an answer given by George G. Campbell, in his testimony, is sufficient to show its object, and its want of good faith. The answer is as follows: "I don't know that I made the assignment so that I could be a witness in case of a suit, but it was made so that in case I did recover anything by the suit it could not go to the creditors of the firm," (a firm of which he was a member.)

These remarks are sufficient to show, that, if George G. Campbell be a competent witness, the Court could give little consideration to his testimony. It would be entirely insufficient to sustain the claim of the complainant against the weight of evidence on the other side going to show that nothing was due from the trustee.

The account prayed for is denied, and the bill will be dismissed.

It is not necessary to examine the other question raised on the argument, whether Robert G. Campbell is the proper complainant in this suit.

Order accordingly.